## BURCHETT v. MYERS.

. No. 13298.

United States Court of Appeals
Ninth Circuit.

March 11, 1953.

no support to his contention on the present facts.

Douglas A. Busey, Reno, Nev., Springmeyer & Thompson, Reno, Nev., Charles M. Stark and Paul W. McComish, San Francisco, Cal., for appellant.

T. L. Withers, Reno, Nev., and Kearny & Adams, Reno, Nev., for appellee.

Before MATHEWS, BONE and POPE, Circuit Judges.

BONE, Circuit Judge.

Appellant Burchett filed a voluntary petition in bankruptcy and was adjudicated a bankrupt on December 12, 1949. The referee in bankruptcy subsequently sustained objections to his discharge which had been filed by the trustee in bankruptcy, G. E. Myers, and a creditor, Jerry Zolezzi, and entered an order denying discharge. On petition for review the District Judge affirmed the order and Burchett has appealed.

The District Judge rejected as clearly erroneous all findings of the referee except those sustaining trustee's objection No. 1 and Zolezzi's objection No. 1. We therefore need not concern ourselves with certain other objections made by Zolezzi and sustained by the referee. The two objections which are here in issue were grounded upon allegation that the bankrupt failed to keep or preserve adequate books of account or records from which his financial condition and business transactions could be ascertained.

Appellant contends that the referee erred in allowing amendments to the specifications of objection of the trustee and Zolezzi after the last day fixed for the filing of objections, which was June 12, 1950. It appears that when the trustee filed his specification of objection on June 10, 1950, it had not been verified. The referee permitted verification at the time of the hearing on the objections to discharge on July 17, 1950.

Lack of verification is not fatal. The defect may be waived. In re Baerncopf, D.C.E.D.Pa., 117 F. 975; 1 Collier on Bankruptcy 1279 (14th Ed.1940). The lack of verification may be supplied by amendment. In re Shanks, D.C.D.Minn., 19 F.2d 796; In re Hanna, 2 Cir., 168 F. 238; 1 Collier on Bankruptcy 1279 (14th Ed.1940).

When the referee at the hearing orally gave the trustee permission to verify the specification, counsel for appellant, who was present, remarked: "I won't make any contention that it has to be verified." This was an express waiver of the defect. Even absent a waiver, it was plainly within the discretion of the referee to permit the verification by amendment.

The referee also permitted amendment of the specifications of objection of Zolezzi. As filed on June 12, 1950, Zolezzi's objection No. 4 read as follows:

"That the bankrupt has failed to keep or preserve adequate records or books of account from which his financial business and transactions may be properly ascertained and has by fraud and deceit either concealed, transferred to others or unlawfully disposed of the proceeds of the said security."

The reference to the "said security" in the quoted specification related to certain other specifications of objection of Zolezzi which are not here pertinent. On July 20, 1950 the referee allowed amendments to Zolezzi's specifications of objections. As amended, Zolezzi's objection No. 1 reads as follows:

"That the bankrupt failed to keep or preserve books of account or records, from which his financial condition and business transactions might be ascertained."

The amendment makes no substantial change in the original specification quoted, and it patently falls outside the rule prohibiting the allegation of new matter in an amendment. No conceivable prejudice

could have resulted from the allowance of the amendment. The question whether amendments should be permitted rests in the sound discretion of the bankruptcy court, and we are clearly of the opinion that there was no abuse here.

■ Appellant also urges that the specifications here in question were insufficient for failure to allege with particularity wherein the books and records of appellant were deficient.

The material portion of § 14, sub. c, of the Bankruptcy Act, 11 U.S.C.A. § 32, sub. c, reads as follows:

"The court shall grant the discharge unless satisfied that the bankrupt has * * * (2) * * * failed to keep or preserve books of account or records, from which his financial condition and business transactions might be ascertained, unless the court deems such acts or failure to have been justified under all the circumstances of the case."

The specifications in issue were drafted substantially in the language of § 14, sub. c. It is well settled that an objection to discharge on the ground of failure to keep or preserve adequate books or records is sufficient if averred in the general language of the statute. In re Feuer, 2 Cir., 4 F.2d 892, 893; In re Biro, 2 Cir., 107 F.2d 386; 1 Collier on Bankruptcy 1276 (14th Ed. 1940).

■■ Neither can we accept appellant's argument that the specifications were defective for not alleging that the failure of the bankrupt to keep adequate books or records was unjustified. It is no part of the objector's case to allege and prove lack of justification. When failure to keep adequate books or records is established, the burden of justification is upon the bankrupt. Rosenberg v. Bloom, 9 Cir., 99 F.2d 249; In re Wellin, 7 Cir., 132 F.2d 262; In re Underhill, 2 Cir., 82 F.2d 258; 1 Collier on Bankruptcy 1352–1353 (14th Ed.1940).

The bankrupt's principal contention is that the referee and the district judge erred in denying him a discharge on the ground of failure to keep adequate books or records. The argument is that his records were wholly sufficient to establish his financial condition and business transactions, in light of the fact that he was only a salaried employee and not regularly engaged in a business for himself.

The records of the bankrupt are indeed impressive in volume. There are hundreds of disordered documents, consisting of deeds, real esate contracts, escrow instructions, bills of sale, inventories, financial statements, bills, receipts, check books, cancelled checks, bank statements, correspondence and other items. However, the bankrupt kept no journals, ledgers or other books of account.

The bankrupt filed a schedule with the lower court showing assets of $66,000 and liabilities of $95,395.52.[1] From the testimony and the bankrupt's records the following facts as to his financial history appear.

Appellant previously received a discharge in bankruptcy in 1940 or 1941. From that time until he filed his petition in bankruptcy in the instant case his business affairs were multifarious and complex.

He became majority owner, president and manager of two Nevada corporations, the Silver State Appliance Company and the Nevada Supply Corporation. He obtained the stock of the first partially by way of gift

---

1. The assets figure was shown in the testimony and in the bankrupt's records to be in error. $62,000 of the assets scheduled represents the total of the face values of several of appellant's life insurance policies. The total of their cash surrender values is only a small fraction of this amount. The bankrupt is delinquent in payment of premiums on all but two of the policies, and the two which are not in default are the property of a former wife under a property settlement agreement. Of the remaining $4000 of assets scheduled, $3000 represented appellant's one-third interest in a parcel of property known as "Harrah's Redwood Lodge," in Reno, Nevada. This property was lost to appellant by foreclosure of a trust deed thereon shortly before his petition in bankruptcy. The only other asset of the bankrupt is a heavily encumbered parcel of real property at 1108 Arlington Avenue in Reno. The estimated value of this property over incumbrances, is $1000.

and partially by a 1945 property settlement agreement with his wife, Chloe V. Burchett, from whom he was divorced in November, 1947. The second corporation was organized by him in 1947.

In May of 1948 he made a gift of all of of his stock in these two corporations (which stock was at that time valued at $32,000) to his two sons. He continued to work as vice-president and manager of the Silver State Appliance Company and as manager of the Nevada Supply Corporation.

The bankrupt also engaged extensively in the buying and selling of real estate. During the period from 1944 to 1948 he purchased, individually or with others, eight parcels of property with purchase prices aggregating approximately $155,000. The purchases were generally made on contracts calling for the bulk of the purchase price to be paid in installments or were financed by means of secured loans. He sold five of these properties. Of the three remaining parcels he retained only one. A second was forfeited in June of 1948 due to default by the bankrupt on a conditional sales contract on which he had paid approximately $6000. The third was lost by foreclosure of a trust deed thereon shortly before the filing of his petition in bankruptcy.

Appellant remarried early in 1948 and was again divorced in June of the same year. Under a property settlement agreement he was obliged to turn over to his wife an automobile and an insurance policy, to pay her $200 a month for 12 months and to pay the debts incurred by her during their brief marriage.

According to his testimony, the bankrupt became insolvent at some time during the latter half of the year 1948.

The foregoing statement of facts exhausts all matters in this case about which we can have any certainty. What remains is a penumbra of incomplete and confusing records, aided not at all by the bankrupt's hazy and inaccurate recollections and explanations.

The first meeting of creditors involved five separate hearings extended over a period of five months.[2] In the course of these hearings the bankrupt introduced a financial statement, dated October 31, 1947, which had been prepared by him for the First National Bank of Nevada, in Reno. According to this statement, appellant at that time had total assets of $124,328.50 and liabilities of $21,222.50. On questioning, however, appellant admitted that there were gross inaccuracies in the statement.[3]

Appellant also introduced a so-called balance sheet for April 15, 1948, which was completed by the bankrupt and his accountant, Joseph Redman, after bankruptcy proceedings had been commenced. The document shows total assets of $100,609.15 and liabilities of $56,959.15. Checked against the records, this statement also appears questionable.[4]

Attempts to obtain an understanding of the bankrupt's business transactions at the various sessions of the first meeting of creditors resulted only in confusion. At the fourth session appellant offered to employ his accountant at his own expense to prepare a report of his finances. The accountant, Joseph Redman, was instructed to determine whether the financial state-

2. The proceedings in the five hearings of the first meeting of creditors were by stipulation made a part of the record of the hearing on objections to discharge.

3. Apparently at least $22,000 in liabilities was not entered on this statement. At least one parcel of property, consisting of two lots on Lake Tahoe, was not accounted for.

4. Under "Assets" on this balance sheet there is listed "Real Estate........$55,-492.65." According to the bankrupt's

records he at that time owned only two parcels of property and a one-third interest in a third parcel. From the purchase prices of these properties and their valuation in the statement of October 31, 1947, we cannot see how they could have had a value of more than $30,000. In the same balance sheet, under "Liabilities", there is an entry showing a real estate lien of $5000 on property called the "Log Cabin" property on Lake Tahoe. The records indicate that this property had been sold in 1947.

ments of the bankrupt could be verified by records, to attempt to resolve the discrepancies between the various statements and records, and to prepare a complete report.

The resulting report was a one-page summary of real estate transactions involving seven of the eight parcels of real property to which we have previously referred. Redman testified that in making the report he had had recourse to all of the records kept by the bankrupt, a work sheet prepared by the bankrupt's present wife, the books of the corporations which the bankrupt managed, and the banks with which the bankrupt had done business.

He testified that the report was as complete as he could give, that very little was revealed by the bankrupt's bank accounts, and that he could not from his investigation draw any inference that the bankrupt had any assets other than those scheduled with the petition in bankruptcy.

In his report Mr. Redman indicated the sources from which he obtained his information. No source at all is indicated for certain of the entries.[5]

If, as the bankrupt insists, we accept the bankrupt's financial statement of October, 1947 and his balance sheet of April 8, 1948, as being reasonably accurate, and fully credit the accountant's report, it is obvious that the latter is only a beginning toward an adequate accounting of the bankrupt's business transactions. The bankrupt's real estate ventures do not account for the rapid depletion of his net worth from a purported $103,000 on October 31, 1947 (per the financial statement of that date) to $54,000 on April 15, 1948 (per the balance sheet of that date). Indeed, there appears to have been a gain from real estate transactions during that period.

Neither is there a satisfactory explanation of the bankrupt's becoming insolvent in the latter part of 1948. The gift of the shares of stock to his sons and the $6000 loss on the forfeiture of a parcel of real estate in June of 1948 furnish only a partial explanation.

We have examined the cancelled checks and bank statements of the bankrupt which appear among his records for the period from April, 1948 to the date of the filing of the petition in bankruptcy. We find that only about $2155 in checks were written during that period. And appellant's income tax returns show salaries from the two corporations of $12,355.91 in 1947, $11,065.00 in 1948, and $7199.00 in 1949.

A possible explanation of the incomplete accounting of the bankrupt's finances lies in his testimony that he sometimes commingled his own business affairs with the affairs of the two corporations which he managed.[6]

5. With reference to two parcels of property on Manor Drive, in Reno, Nevada, alleged to have been sold by the bankrupt in February and March of 1948, there are no records of any sale either among the bankrupt's papers or in his income tax returns. Neither are there any records to be found covering either the purchase or sale of two small lots on Lake Tahoe, allegedly sold by the bankrupt in 1949.

The bankrupt's records create certain puzzles which were never clarified. The most glaring example is the body of records on the sale of certain "Log Cabin" property on Lake Tahoe. There are records showing that this property was sold by the bankrupt and another who had a one-half interest in the property. The selling price was $39,000. There is a record of a statement of the bankrupt's co-owner, made after the sale, that the bankrupt was entitled to 55% of the purchase price remaining unpaid, which was $29,000. In the financial statement of the bankrupt of October 31, 1947, there appears an entry of "Real Estate Sold (Proceeds in Escrow) * * * Log Cabin * * * $6700." Yet in Redman's report it is stated that this same property was sold in July of 1948 for $14,500. This data was apparently obtained from a work sheet prepared by the bankrupt's present wife and from his 1948 income tax return. We find no records indicating that the bankrupt held this property after 1947. The situation is further confused by the bankrupt's testimony at the hearing that he settled accounts with the co-owner of the property for a payment of only $4500.

6. The bankrupt testified that he sometimes drew checks on the corporate bank accounts to pay his personal obligations and that checks drawn in payment of bills due the corporation were at times made payable to him personally. He further testified that on one occasion he had turned over $7000 of his personal assets to the Silver State Appliance Company.

Though he testified that the books of the corporation contained an accurate record of the state of accounts between himself and the corporations, no such books or copies thereof were produced by him.

■■ The test for determining when a bankrupt's books or records entitle him to a discharge in bankruptcy under § 14, sub. c, of the Bankruptcy Act is a loose one. Morris Plan Industrial Bank of New York v. Dreher, 2 Cir., 144 F.2d 60; In re Miller, D.C.D.Md., 5 F.Supp. 913. There must be books or records from which the bankrupt's financial condition can be determined with a fair degree of accuracy and from which his business transactions can be traced for a reasonable period into the past. International Shoe Co. v. Lewine, 5 Cir., 68 F.2d 517; In re Underhill, 2 Cir., 82 F.2d 258; 1 Collier on Bankruptcy 1343 et seq. (14th Ed.1940). The requirements are relaxed when the bankruptcy court is satisfied from all the circumstances in the case that failure to keep adequate books or records was justified. See, e. g., Hedges v. Bushnell, 10 Cir., 106 F.2d 979; Morris Plan Industrial Bank v. Henderson, 2 Cir., 131 F.2d 975; Texas National Bank of Beaumont v. Edson, 5 Cir., 100 F.2d 789; In re Servel, D.C.E.D.Idaho, 30 F.2d 102. Each case rests upon its own facts. In re Underhill, supra; Rosenberg v. Bloom, 9 Cir., 99 F.2d 249; In re Marx, 7 Cir., 125 F.2d 335. The question of the right to a discharge is addressed to the sound discretion of the bankruptcy court, with the exercise of which, except in case of gross abuse, an appellate court will not interfere. Baash-Ross Tool Co. v. Stephens, 9 Cir., 73 F.2d 902; Hultman v. Tevis, 9 Cir., 82 F.2d 940; Rosenberg v. Bloom, 9 Cir., 99 F.2d 249; In re Marx, supra; Klein v. Morris Plan Industrial Bank, 2 Cir., 132 F.2d 809, 144 A.L.R. 1278.

■■ We think there was no abuse of discretion in denying a discharge in this case. The interest protected by § 14(c) is that of creditors. A discharge in bankruptcy is not to be had for the asking. Creditors are not required to risk the withholding or concealment of assets by the bankrupt under cover of a chaotic or incomplete set of books or records.

Somewhat analogous to the case at bar is the case of In re Underhill, 2 Cir., 82 F.2d 258. In that case the bankrupt was not regularly engaged in a business, though he traded extensively in the stock market. He was trustee and remainderman of two estates from which he withdrew large amounts. The only records which he kept were canceled checks, check stubs and brokerage statements which left the disposition of substantial assets unaccounted for. The bankruptcy court granted his discharge. The Court of Appeals reversed, saying 82 F.2d at page 260:

"Where the bankrupt was involved in many transactions of an extensive character, a substantially accurate and complete record of his affairs is a prerequisite to his discharge. With obligations outstanding in large sums in the form of notes to banks and to others, it was a matter of importance that this bankrupt maintain records from which his financial condition could be ascertained. His attempt to substitute stubs and brokerage accounts through brokerage statements for books which should reflect his true business transactions is insufficient to comply with the requirements of the Act."

■ We do not say that appellant was required to keep impeccable books of account covering his personal finances. But where a bankrupt's transactions are of the scope and complexity of those of appellant, there should be either books or records, orderly kept, which, together with the recollections and explanations of the bankrupt, will form the basis for a reasonably accurate and complete accounting of his business affairs. Cf. Rosenberg v. Bloom, 9 Cir., 99 F.2d 249; Benjamin v. Jaspan, 2 Cir., 144 F.2d 58.

Here neither the bankrupt nor his accountant could untangle or supplement the morass of disjointed and incomplete records and memoranda which the bankrupt brought into court. It has been held that where a competent accountant cannot determine a

bankrupt's financial condition, a discharge should be denied. In re Miller, D.C.Md., 5 F.Supp. 913; In re Arnold, D.C.D.N.H., 1 F.Supp. 499. If the books of the two corporations which appellant managed were essential to a complete accounting of his finances, it was incumbent upon the bankrupt to produce such books or copies thereof. White v. Schoenfeld, 2 Cir., 117 F.2d 131; In re Sandow, D.C.S.D.N.Y., 59 F. Supp. 782, affirmed 2 Cir., 151 F.2d 807.

■ There was no showing of justification for the failure to keep adequate books or records in this case. While the bankrupt had only a seventh grade education, he had considerable business experience as manager and president of two corporations. As the experienced District Judge below stated in his opinion, " * * * his [the bankrupt's] testimony does not indicate him to be a man of minute intellect." Further, he was not unfamiliar with bankruptcy proceedings and the requirements for a discharge, since he had previously received a discharge in bankruptcy in 1940 or 1941.

The bankrupt contends that the referee applied an erroneous rule of law in denying his discharge, in that the referee in effect held that formal books of account were required. We think not. It is true that the referee questioned the bankrupt extensively during the first meeting of creditors as to whether he had kept any books of account. However, at the hearing on the objections to discharge, the following colloquy occurred:

"Referee: Now I am certainly not going to call those things [the records of appellant] 'books!'

"Mr. Thompson [Attorney for the bankrupt]: I don't call them books either, your Honor. They are records. They are not books in the sense of an accounting book.

"Referee: All right, then, do they comply with the statute? From those records can you determine the business dealings and the financial condition of the bankrupt?

"Mr. Thompson: I believe so, your Honor.

"Referee: But your own auditor, by his own statements, admitted that he couldn't."

After the hearing the referee made the following finding of fact:

"The Court finds that the bankrupt has failed to keep books of account or records from which his financial condition and business transactions might be ascertained."

■ We think it plain that the referee recognized the rule that the requirement of § 14, sub. c, is in the alternative—that either books *or* records are sufficient so long as they make it possible to ascertain the financial condition and business transactions of the bankrupt. The opinion and findings of the District Judge indicate that he held a similar view.

The bankrupt argues that the trustee failed to examine his records to determine whether they were sufficient, and that the referee should have ordered him to do so. There is evidence that the trustee looked through the records to determine what they were. On the basis of a cursory survey he gave his opinion that they were insufficient. He was corroborated by the testimony of the bankrupt's accountant. The fact that he did not make a more detailed examination would affect the weight of his testimony that the books and records were insufficient, but we are not advised of any rule under which the trustee could be required by the court to make an exhaustive examination of a disordered mass of records which apparently could not be intelligently explained by the bankrupt's own accountant.

The order is affirmed.