MANION, Circuit Judge.
The United States Trustee appointed Ronald R. Peterson bankruptcy trustee for the bankruptcies of Richard Scott, Douglas W. Scott, and Douglas H. Scott. Peterson brought an adversary complaint against them, seeking a denial of the discharge of their debts. The complaint alleged that the Scotts intentionally concealed their assets, and failed to keep and preserve adequate financial information. The bankruptcy court found against the trustee, and the district court affirmed. We conclude that the lower courts did not apply the correct legal standards to Peterson’s claims, and therefore we reverse and remand for further proceedings consistent with this opinion.
I.
Douglas H. Scott brought his son Richard Scott into his real estate investment business in 1969. In 1974, Douglas W. Scott, also Douglas H.’s son, joined the business. They primarily invested in single family homes, but they also acquired apartment buildings and office buildings, and later they branched out into horse breeding and film production. As they acquired properties and other investment opportunities, and solicited investors to help fund their investment purchases, they set up partnerships, limited partnerships, and corporations to hold and manage these assets. By the mid-1980s, the Scotts controlled more than 70 corporations, partner *962 ships, or limited partnerships (the “business entities”). The Scotts charged their investors a sizeable fee for managing these investments: at least 26% of the initial investment, plus about 5% per year in management fees. This money was paid to IRE Services, Inc., a corporation set up by the Scotts to manage the numerous corporations and partnerships.
The investments made by the Scotts’ business entities generally yielded a net operating loss every year — the expenses, interest, and depreciation from the investments exceeded the current revenue generated each year. These losses could then be used to offset the investors’ income for tax purposes. And, at least in theory, the real estate and other holdings were appreciating in value every year, so when the properties were sold, the investors would make a profit.
Unfortunately for the Scotts, and their investors, President Reagan proposed substantial tax changes in 1984 (enacted in 1986) which eliminated investors’ ability to use passive investment losses to offset income derived from employment. Also, inflation came down from its highs in the late 1970s to single-digit levels. This had the effect of reducing, and in some cases reversing, the rate of appreciation of real estate. (The Scotts had forecasted inflation to remain at 10% per year.) Finally, many of the Scotts’ investments were in Oklahoma and other areas hard hit by the collapse in oil prices occurring in the mid-1980s. Because of these changes, investors stopped putting new money into the Scotts’ investments, causing insufficient cash flow to cover mortgage payments, expenses and other financial demands. About 50 of the Scotts’ business entities filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code (11 U.S.C. § 1101 et seq.) (reorganization). But not all Scott entities filed for bankruptcy, notably IRE Services, Inc.
On November 15, 1985, each Scott filed for bankruptcy under Chapter 11 of the Bankruptcy Code.[1] By filing under Chapter 11, the debtors became debtors-in-possession, authorized to continue operating their businesses while preparing a plan of reorganization, to be approved by then-creditors. See 11 U.S.C. §§ 1107 & 1108.[2] This plan, and an accompanying disclosure statement, would be reviewed and approved by the bankruptcy court and then circulated to all creditors. Id. at §§ 1121 & 1129. Upon approval of the plan by the creditors, it would become a binding contract between the debtors and the creditors. See, e.g., S.N.A. Nut Co. v. Tulare Nut Co. (In re S.N.A. Nut Co.), 197 B.R. 642, 647 (Bkrtcy.N.D.Ill.1996); accord, Gibbons v. Gardner (In re Alton R. Co.), 159 F.2d 200, 207 (7th Cir.1947) (Bankruptcy Act).
At the time that the Scotts filed then-initial bankruptcy petitions, they did not file their bankruptcy schedules and statements of financial affairs, despite the clear mandate of Rule 1007(e) of the Federal Rules of Bankruptcy Procedure that schedules be filed at the time of filing the petition. About seven months later the debtors finally filed their bankruptcy schedules, in which they revealed that they owned interests in over 70 business entities. However, they identified neither their respective ownership interests in these entities nor the value of their interests in these entities. Schedule B of their bankruptcy schedules stated that “[i]n addition, [the debtors have] a limited partner interest in various partnerships both in and out of Chapter 11 proceedings the value of which can not be determined at this time.” Bankruptcy law requires that *963 debtors list their assets and place a numerical figure representing the value of the assets. See 11 U.S.C. § 521(1); In re Bell, 179 B.R. 129, 130 (Bankr.E.D.Wis.1995) (“ ‘Value,’ as used in the official exemption forms, generally means an approximate dollar amount.”) (citing In re Wenande, 107 B.R. 770, 772 (Bankr.D.Wyo.1989)).
On July 25, 1988, the Scotts filed proposed reorganization plans with the bankruptcy court, and circulated the plans to interested creditors. These plans stated that the unsecured creditors, who were owed as much as $14 million, would receive $25,000 to be divided pro rata among all of the unsecured creditors. Furthermore, the balance of the unsecured debt would be discharged, and the Scotts would retain their interests in the business entities free and clear of any prepetition unsecured debt.
Almost nine months later, on March 28, 1989, the debtors filed with the bankruptcy court three virtually identical proposed disclosure statements. These disclosure statements lumped all of the interests in the business entities into a single line. The Scotts valued their combined interests in all of the entities at $142,000: $60,000 for each of the interests of Richard and Douglas H., and $22,000 for Douglas W.’s interest. The disclosure statements did not explain how these figures were derived.
A few creditors objected to these disclosure statements, and the debtors filed another disclosure statement, the First Amended Disclosure Statement, roughly a month later. This disclosure statement, however, contained the same information with regard to the business entities. Moreover, the Scotts refused to produce any records regarding their interests in the corporations or partnerships not in bankruptcy.
Finally, in November 1989, the bankruptcy court ordered the Scotts to turn over their records regarding the business entities not in bankruptcy. A week later, the Scotts circulated a Second Amended Disclosure Statement revealing their interest in Burr Oaks Associates, a partnership not in bankruptcy at that time. (The Scotts did not file this disclosure statement with the bankruptcy court.) Burr Oaks Associates was owned by two partnerships, Group B and Group G partnerships. The general partners of these partnerships were the Scotts themselves and also IRE, Incorporated, a corporation wholly owned by the Scotts. The effect of this arrangement, both legally and practically, was that Burr Oaks Associates was owned by the Scotts (through their ownership interests in Groups B & G)[3] and controlled by the Scotts (as general partners and officers of the general partner of Groups B & G).
The Second Amended Disclosure Statement revealed that Burr Oaks Associates received about $480,000 in cash in early 1989, and had invested the money in high risk bonds, also called debentures. Receipt of this money occurred just before Richard Scott appeared to testify at the meeting of creditors mandated by § 341 of the Bankruptcy Code. It is uncontested that Richard did not reveal the existence of this asset at his § 341 meeting of creditors; he contends that he was not asked about it, and did not have a duty to disclose it.
In January 1990, 'about three months after the Second Amended Disclosure Statement was circulated among the creditors, the U.S. Trustee asked the bankruptcy court to remove the Scotts as debtors-in-possession and to appoint a trustee to supervise the bankruptcies. See 11 U.S.C. § 1104. The U.S. Trustee alleged that the debtors had been dilatory about fulfilling their duties as debtors-in-possession, had engaged in gross mismanagement of their *964 business interests, and had engaged in dishonest and fraudulent behavior before and during their tenure as debtors-in-possession. The bankruptcy court granted the motion of the U.S. Trustee, and appointed Peterson Chapter 11 Trustee for all three bankruptcies.
Trustee Peterson then retained Craig Elson, a forensic accountant who specializes in reviewing the books and records of entities suspected of fraud. Elson and Peterson began to review the books and records of the Scotts and their business entities. Elsoris work, however, was frustrated by two circumstances. He and Peterson discovered that a computer database, maintained by the debtors to allow them to track the thousands of transactions between the various business entities and also to third parties, became unusable, as did the back-up tapes. Peterson employed a service which specializes in recovering lost data, but no usable portion of the database was recoverable. Thus, the trustee was required to trace transactions through the Scotts’ written records.
The second obstacle faced by Peterson and Elson is that the Scotts substantially disregarded independent corporate forms in managing their cash flow. As accounts receivable and investments were received, the Scotts would deposit the monies into one clearinghouse account, regardless of the money’s source. They would also withdraw money from this account, and put it towards the most pressing expenses. The Scotts would then characterize the withdrawal as a loan between the business entities, or an advance to one of the Scotts, followed by a capital contribution (or another loan) to another corporation. The Scotts did not consider the financial condition or solvency of each business entity as they went through these machinations.
Transactions such as these were made every day; Elson discovered thousands of similar transactions. He testified as to one particular example as a representative transaction. TGS-84, a partnership set up to acquire property from another partnership, raised $179,600 in November, 1984. Within a week of that money being deposited into an account in the name of TGS-84, substantially all of these proceeds were disbursed for the benefit of the Scotts’ other business entities. For example, on November 26,1984, TGS-84 issued a check in the amount of $18,571.57. The records of the Scotts indicate that this money went to Dennis and Cecelia Morand; the check however was paid to the Gary-Wheaton Bank, which then issued a cashier’s check. The cashier’s check was then paid over to the Morands to satisfy a debt owed to them by Transmission America, a different corporate entity owned by the Scotts. TGS-84 had no commercial relationship whatsoever with the Morands or Transmission America (except that Transmission America was also owned by the Scotts). Presumably, TGS-84 loaned Transmission America the money paid to the Morands. Or perhaps the money was loaned to the Scotts, who then invested the money into Transmission America. On November 21, 1984, TGS-84, again through a cashier’s check, paid $17,979.01 to the Internal Revenue Service. The Scotts’ records reflect that this payment was made on behalf of IRE Services, Inc. for payroll taxes for the second quarter. Elson was unable to discover any documentation of these “loans,” including any terms of the loan, such as the rate of interest or duration of the loan. In sum, TGS-84 took $179,500 in capital from limited partners between November 2 and November 20, 1984, and between November 15 and November 26, 1984, TGS-84 disbursed $179,510.23 to or for the benefit of other Scott entities. Thus, to unravel the net worth of TGS-84, just days after almost $180,000 had been paid into it, a creditor or trustee would have to assess the financial condition of Transmission America and the other entities who received funds in similar fashions. And to assess the financial condition of Transmission America, the trustee would have to examine all of the other advances made to and by Transmission America. Moreover, *965 none of the money deposited into the TGS-84 account during this time period was used for TGS-84’s stated investment purposes. Elson also noted that between November 1984 and December 1985, TGS-84 received more than $540,000 in investment capital from limited partners, and disbursed about the same amount to other Scott business entities. After explaining the process used with regard to TGS-84, Elson then testified as to similar practices involving other entities controlled by the Scotts.
The decision by the Scotts to liberally “loan” money from one controlled entity to another had several repercussions. For investors, the principal effect was to tie the financial future of one entity to that of all the others; corporate distinctions disappear when each Scott entity owes money to, and also has borrowed money from, other Scott entities. For Peterson, this business arrangement requires him to assess the financial condition of all of the entities, in order to appraise any of the Scotts' financial condition. Moreover, as some of the business entities were in bankruptcy and some were not, all of the transactions would have to be assessed to determine what the non-debtor entities were worth. It is primarily this practice Peterson objected to.
In January 1990, after reviewing the Scotts’ financial condition, Peterson determined that the Scotts’ investments were not economically viable, and that no reorganization was feasible. He asked the bankruptcy court to convert the case to a ease under Chapter 7 of the Bankruptcy Code (liquidation), and the bankruptcy court did so. The U.S. Trustee then appointed Peterson as Chapter 7 trustee, see 11 U.S.C. § 701, and Peterson began the process of liquidating the Scotts’ various interests in the business entities.
On July 6, 1990, Trustee Peterson filed an adversary complaint against Richard E. Scott, Douglas H. Scott and Douglas W. Scott. The complaint sought to deny the debtors a discharge for failing to account for funds missing from the estate, for failing to keep adequate books and records from which their financial condition could be ascertained, and for intentionally concealing property of the estate through false and misleading disclosure statements. See generally 11 U.S.C. § 727(a). After discovery, cross-motions for partial summary judgment were filed by the parties regarding the disclosure statements. The trustee contended that the disclosure statements, prepared by the debtors, did not reveal the debtors’ interests in solvent business entities and the liquid assets held by these entities (such as the $480,000 held by Burr Oaks Associates). In January 1992, the bankruptcy court granted the Scotts partial summary judgment. He ruled that, as a matter of law, representations in disclosure statements, even if intentionally false, could not serve to conceal the financial condition of the debtor promulgating the disclosure statement. The bankruptcy court reasoned that the “court’s approach to disclosure statements may cause some debtors to be evasive or dilatory in providing information. However, if this happens, parties in interest may move to convert or dismiss a case under Code § 1112(b).”
In April 1993 the case went to trial on the remaining claims. At the close of Peterson’s case-in-chief, the Scotts moved for judgment as a matter of law, pursuant to Bankruptcy Rule 7052 (incorporating Fed. R.Civ.P. 52(c)).[4] In October 1993, the bankruptcy court granted this motion as to Douglas W. and Douglas H. The bankruptcy court held that the trustee had failed to prove that Douglas W. and Douglas H. had personally committed any acts which would justify a denial of discharge. Furthermore, the district court declined to impute the actions or intent of Richard to *966 either Douglas. In addition, he declined to hold the Douglases responsible for the complexity of their records, stating that denial of discharge must be based on criminal or actual dishonesty which is quasi-criminal in nature.
On February 1, 1994, the trial resumed, with only Richard Scott remaining as a defendant. At the close of the defendant’s case, the bankruptcy court issued an oral ruling, finding that all transactions were fully documented. Furthermore, the bankruptcy court held that the sheer complexity of records could not establish an intent to hinder, delay or defraud creditors. The bankruptcy court explicitly limited his ruling to these issues; he did not rely on the testimony of Richard Scott in making his finding of no intent.
The trustee appealed these decisions to the district court, and the case was assigned to District Judge Brian Barnett Duff. During the pendency of the appeal, Richard and Douglas W. Scott were convicted of RICO conspiracy and mail fraud, and Richard Scott was also convicted of making false statements to the S.E.C. The district court remanded the case to the bánkruptcy court for reconsideration in light of the criminal convictions of two of the debtor-defendants. On remand, the bankruptcy court declined to alter his ruling, and a new appeal was taken. The case was reassigned to District Judge Joan B. Gottschall, and she affirmed the decisions of the bankruptcy court.
II.

A. Standard of Review

We review the bankruptcy and district courts’ legal interpretations de novo; however, we review findings of fact entered by the bankruptcy court only for clear error. See, e.g., Ginter v. Crosswhite (In re Crosswhite), 148 F.3d 879, 881 (7th Cir.1998). A threshold question we must address is by what standard of proof must the trustee establish grounds for denial of discharge under 11 U.S.C. § 727(a). It appears that neither the Supreme Court nor this court has ever formally addressed this question. See, e.g., Village of Waunakee v. Krehl (In re Krehl), 86 F.3d 737 (7th Cir.1996) (no discussion of plaintiffs burden of proof). However, the Supreme Court has addressed this issue with respect to exceptions to discharge under 11 U.S.C. § 523(a). See Grogan v. Garner (In re Garner), 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). In Grogan, the Supreme Court held that exceptions to discharge are essentially a civil matter, and that the preponderance of the evidence represents a fair balance. Id. In so doing, the Supreme Court specifically referenced the legislative history to 11 U.S.C. § 727(a): “Most notably, Congress chose the preponderance standard to govern determinations under 11 U.S.C. § 727(a)(4)....” Id. at 289, 111 S.Ct. 654 (citing H.R.Rep. No. 95-595, at 384 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6340). The reasoning of the Supreme Court is equally applicable to denials of discharges under § 727(a): the debtor has no fundamental right to a discharge, and does not have a sufficient interest in a discharge to warrant a heightened standard of proof. Grogan, 498 U.S. at 286, 111 S.Ct. 654. Also, the “fresh start” policy of the Bankruptcy Code is properly limited to the honest but unfortunate debt- or. Id. at 286-87, 111 S.Ct. 654. At least four other circuits have found Grogan’s rationale equally applicable to § 727(a), as have bankruptcy courts in this circuit. See, e.g., Barclays/American Bus. Credit, Inc. v. Adams (In re Adams), 31 F.3d 389, 394 (6th Cir.1994); Farouki v. Emirates Bank Int’l (In re Farouki), 14 F.3d 244, 249 n. 17 (4th Cir.1994); Beaubouef v. Beaubouef (In re Beaubouef), 966 F.2d 174, 178 (5th Cir.1992); First Nat'l Bank v. Serafini (In re Serafini), 938 F.2d 1156, 1157 (10th Cir.1991); Transamerica Premier Ins. Co. v. Chaplin (In re Chaplin), 179 B.R. 123, 127 (Bankr.E.D.Wis.1995). We conclude, as did the lower courts in this case, that the trustee must establish grounds for denial of discharge under 11 *967 U.S.C. § 727(a) by a preponderance of the evidence.

B. Misrepresentations in Disclosure Statements

Count III of the trustee’s Adversary Complaint alleged that the Scotts intentionally concealed assets by failing to disclose the extent of their interest and the values of the various entities controlled by the Scotts. See 11 U.S.C. § 727(a)(2).[5] The bankruptcy court granted summary judgment to the Scotts on this claim, holding that representations as to the liquidation values of assets in disclosure statements cannot, as a matter of law, constitute concealment.
“Concealment ... includes preventing discovery, fraudulently transferring or withholding knowledge or information required by law to be made known.” United States v. Turner, 725 F.2d 1154, 1157 (8th Cir.1984). Cf. Black’s Law Dictionary 289 (6th ed.1990) (concealment means the “withholding of something which one knows and which one, in duty, is bound to reveal.... ”). There is no question in this case that Richard Scott was aware of the $480,000 payment made to Burr Oaks Associates shortly before preparing and submitting the proposed disclosure statements. The key issue is whether he had a duty to disclose it. The bankruptcy court found that he did not, though the court candidly admitted that this “approach to disclosure statements may cause some debtors to be evasive or dilatory in providing information.” The district court adopted the same rationale, stating that “[t]he structure of Chapter 11, then, takes into account that debtors in possession may be less than totally forthright concerning their affairs.”[6]
 There is no basis for the lower courts’ suggestion that the Bankruptcy Code does not place on the debtors-in-possession an obligation to candidly disclose assets. In submitting a disclosure statement, the debtors have a duty to provide “adequate information,” defined as “information of a kind, and in sufficient detail as far as is reasonably practicable in light of the nature and history of the debt- or and the condition of the debtor’s books and records, that would enable a hypothetical reasonable investor ... to make an informed judgment about the plan.... ” 11 U.S.C. § 1125(a)(1). As the Scotts planned to keep the seventy or so business entities for themselves, the value of these entities is clearly what an investor would need to have to decide an appropriate response to the Scotts’ plans. Moreover, “complete financial disclosure [is] a ‘condition precedent’ to the privilege of discharge.” United States v. Ellis, 50 F.3d 419, 424 (7th Cir.1995). The debtor-in-possession owes a fiduciary duty to his creditors, see Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir.1991), and that duty requires the debtor-in-possession to “furnish such information concerning the estate and the estate’s administration as is requested by a party in interest.” 11 U.S.C. § 704(7).[7] *968 Given this law, and the significance of the business entities to the Scotts’ bankruptcy, we conclude that the debtors had an obligation to disclose the nature and extent of the interests they held in the business entities.
It appears that the lower courts’ rulings in this case are without precedent on this issue. The parties have cited no authority, nor have we found any, which holds that a particular type of statement cannot form the basis of an action for concealment. To the contrary, in McCormick v. Security State Bank (In re McCormick), 822 F.2d 806, 807-08 (8th Cir.1987), a debtor was denied a discharge for lying to a bank in an interview about his financial ability to make a payment on a loan owed to the bank. If an oral statement, not made under oath, can constitute concealment, then a disclosure statement propounded to all creditors with a request for bankruptcy court approval is certainly worthy of the same status. See also Smiley v. First Nat'l Bank (In re Smiley), 864 F.2d 562, 568 (7th Cir.1989) (“Mr. Smiley not only failed to volunteer information, but he misrepresented the value of his assets.”).
Both the bankruptcy court and the district court also relied heavily on the fact that in this case, the creditors and U.S. Trustee pursued the debtors to obtain more information by filing objections to the disclosure statements and appearing at court hearings. In essence, the lower courts held that because the creditors and U.S. Trustee did not ultimately rely on the representations in the disclosure statement to their detriment, no concealment was effected by the Scotts. However, we have previously held that a concealment or transfer under § 727(a)(2) may occur even if no creditors are harmed by it. “Proof of harm is not a required element of a cause of action under Section 727.” Smiley, 864 F.2d at 569 (7th Cir.1989); see also In re Snyder, 152 F.3d 596, 601 (7th Cir.1998). Disclosure statements are for the purpose of disclosure; the intentional withholding of relevant information is not sanctioned by the Bankruptcy Code.

C. Failure to Keep Adequate Books and Records

Peterson presented evidence in his casein-chief showing that the manner in which the Scotts kept their personal records, and the records of the business entities, effectively concealed where investors’ money went. The maze of entities and the transactions among them, complicated by 435 boxes of “supporting” documents, hid whatever assets the estate had. At the close of Peterson’s case-in-chief, the bankruptcy court granted judgment to the two Douglas Scotts, finding no evidence that either of the Douglases had engaged in any conduct which would justify a denial of discharge under § 727(a)(3).[8] The bankruptcy court held that the trustee “ha[dj not shown that Douglas Scotts had such knowledge of or such indifference to the record keeping that this court finds them so culpable that the court could deny their discharges under Code § 727(a)(3).” He reasoned that “denial of discharge is such a harsh sanction that it should be based on criminal conduct, or actual dishonesty quasi-criminal in nature.” At the conclusion of the trial, the bankruptcy court granted judgment to Richard Scott, finding that the trustee has an obligation to sift through the records of a debtor, and to cooperate with the debtor.
*969 The bankruptcy court did not apply the correct legal standards to this claim. Section 727(a)(3) does not require proof of criminal or quasi-criminal conduct; rather, a transfer or removal of assets, a destruction or other wasting of assets, or a concealment of assets is all the trustee must prove. Concomitantly, intent is not an element of proof under § 727(a)(3). See, e.g., In re Juzwiak, 89 F.3d 424, 430 (7th Cir.1996) (“creditors do not need to prove that the debtor intended to defraud them in order to demonstrate a § 727(a)(3) violation”).
Also, the existence of a complete set of records does not necessarily satisfy § 727(a)(3); both statute and case law support this conclusion. Section 727(a)(3) provides that a debtor be denied a discharge if he has “failed to keep or preserve any recorded information ... from which the debtor’s financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.” In this context, “keep” and “preserve” are not synonyms. “Keep” has the same meaning it would have in phrases such as “to keep a diary” or “to keep a record,” that is, to maintain a record by entering it in a book. Otherwise, the repetition of the word “preserve” is superfluous, a disfavored result. See, e.g., Mackey v. Lanier Collection Agency & Serv., 486 U.S. 825, 837 & n. 11, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (statute should be interpreted to give meaning to every word) (collecting cases). Also, the text of the statute does not merely require that the debtor not lose any records; rather, it authorizes denial of discharge where the debtor “fails to act” unless the “failure to act” is justifiable. This language places an affirmative duty on the debtor to create books and records accurately documenting his business affairs. Juzwiak, 89 F.3d at 429 (“The debtor has the duty to maintain and retain comprehensible records.”) (citations omitted). The debtors maintained a computer database of their various transactions, and perhaps this would have allowed the trustee to ascertain their financial condition and business transactions. However, this database became unusable before Peterson was appointed trustee.
The purpose of § 727(a)(3) is “ ‘to make the privilege of discharge dependent on a true presentation of the debtor’s financial affairs.’ ” Cox v. Lansdowne (In re Cox), 904 F.2d 1399, 1401 (9th Cir.1990) (quoting In re Underhill, 82 F.2d 258, 260 (2d Cir.1936)). This statute “ensures that trustees and creditors will receive sufficient information to enable them to ‘trace the debtor’s financial history; to ascertain the debtor’s financial condition; and to reconstruct the debtor’s financial transactions.’ ” Juzwiak, 89 F.3d at 427-28 (citation omitted). In the absence of § 727(a)(3), debtors without proper books and records could obtain a discharge while frustrating a trustee’s ability to liquidate prepetition assets to satisfy prepetition debts. “Creditors are not required to risk the withholding or concealment of assets by the bankrupt under cover of a chaotic or incomplete set of books or records.” Cox, 904 F.2d at 1401 (quoting Burchett v. Myers, 202 F.2d 920, 926 (9th Cir.1953)).
The Seotts’ case is analogous to In re Juzwiak, 89 F.3d 424 (7th Cir.1996). In the Seotts’ case, the bankruptcy court held that the trustee “had better go get someone from the debtor to cooperate with them in identifying all of the records. There is a problem when many records are turned over to a trustee to analyze those records. However, that is the obligation of the trustee.” Along these same lines, the bankruptcy court in Juzwiak found that “Juzwiak’s financial transactions could be constructed from the records submitted if the creditors hired an accountant to go over the records with Juzwiak.” 89 F.3d at 428-29. In Juzwiak, we reversed the bankruptcy court, noting that “[creditors are not required ‘to sift through documents and attempt to reconstruct the flow of the debtor’s assets.’ ” Id. at 429 (citations omitted). Similarly, the bankruptcy *970 court in this case held that the trustee would have to reconstruct the financial condition of the Scotts and their business entities, despite Elson’s testimony that it would be a Herculean effort to do so. The trustee would have to comb through 435 boxes of records produced by the Scotts, and document the entire maze of transactions between the Scotts and their business entities. But as we noted in Juzwiak, the trustee does not have the obligation to undertake this.[9]
Another case with significant similarity is United Mortgage Corp. v. Mathern (In re Mathern), 137 B.R. 311 (Bankr.D.Minn.1992), aff'd. on other grounds, 141 B.R. 667 (D.Minn.1992). Like the Scotts, the Math-erns created a financial empire involving over 50 corporations and partnerships. After filing for bankruptcy, the Matherns produced tens of thousands of documents which, in the trustee’s view, formed an impenetrable maze of transactions. The bankruptcy court recognized that “[s]ection 727(a)(3) serves a statutory goal of fair dealing, by requiring a debtor to furnish a satisfactory written record and accounting for his current financial condition and for the nature of his business transactions for a reasonable period in the past, upon demand of a trustee or creditor.” Id. at 317 (citing In re Drenckhahn, 77 B.R. 697, 708 (Bankr.D.Minn.1987)). While the bankruptcy court in Mathem found a question of fact regarding Mathern’s books and records, the bankruptcy court accepted the legal theory that the complexity of the records could be enough to form the basis of a § 727(a)(3) violation.
Krohn v. Frommann (In re Frommann) is another ease involving complex records:
The Debtor provided the Trustee with a carton of records consisting of bills, checks, bank statements, and closing statements with respect to sales of real estate properties. The Debtor maintains that these written records readily establish her financial condition. However, a debtor cannot simply place sacks of records before the bankruptcy judge or trustee and request the judge- or trustee to sift through the documents and attempt to reconstruct the flow of the debtor’s assets.
153 B.R. 113, 118 (Bankr.E.D.N.Y.1993) (citing In re Hughes, 873 F.2d 262, 264 (11th Cir.1989)). The same holds true for the Scotts; however, the Scotts placed 435 cartons worth of records before the trustee. See also Havel v. Vandewoestyne (In re Vandewoestyne), 174 B.R. 518, 522 (Bankr.C.D.Ill.1994) (“courts have held that ‘too many’ is just as bad as ‘not enough’ ”).
We have no doubt that the principal concern of § 727(a)(3) is debtors who destroy or hide their records. Moreover, most bankruptcies are consumer-type bankruptcies with no assets or business affairs to speak of, and, therefore, the complexity of their business transactions do not implicate § 727(a)(3). But where debtors are sophisticated in business, and carry on a business involving significant assets, creditors have an expectation of greater and better record keeping. See Juzwiak, 89 F.3d at 428. As the debtors in this case lost over $20 million, there might be grounds to question their level of sophistication. But as they solicited the investments made, set up the impenetrable financial maze and directly controlled both the flow of funds and the investment decisions of the business entities, we conclude that they should be held to a higher level of scrutiny than an ordinary debtor. Where debtors fail to maintain books and records from which their financial history and condition can be ascertained, they must be denied a discharge under 11 U.S.C. § 727(a)(3).
III.
The lower courts have applied erroneous legal standards to Peterson’s claims under *971 11 U.S.C. § 727(a)(2) and (a)(3). A remand on each of these claims is required. Under § 727(a)(2), material questions of fact remain regarding whether the Scotts intended to hinder, delay or defraud creditors when they omitted information and misrepresented the value of their assets on the disclosure statements. Similarly, under § 727(a)(3), it is unclear whether the bankruptcy court chose to credit the testimony of Craig Elson, the trustee’s accountant, over the testimony of the Scotts’ accountants. Also, § 727(a)(3) has an affirmative defense which the Scotts may be able to establish. As such, we think it prudent that both claims be retried under the legal standards discussed in this opinion, and without deference to the factual findings made by the lower courts or this court. Thus, we reverse the decisions of the bankruptcy court and the district court and remand the case for further proceedings consistent with this opinion.

. Richard's wife, Marilyn Scott, and Douglas H.’s wife, Sarah Scott, filed joint petitions for bankruptcy with their husbands. Trustee Peterson did not file an adversary complaint against the wives, and their discharges are not at issue.

. Unless otherwise indicated, all statutory section references are to the Bankruptcy Code, Title 11, U.S.Code.

. The Scotts directly and indirectly owned all of the Group G limited partnership, and all but 16% of the Group B limited partnership.

. The bankruptcy court stopped the trial at the close of Peterson’s case. The trial did not resume until February 1, 1994, after the bankruptcy court had issued a written ruling on the Rule 7052 motion.

.Section 727(a)(2) of the Bankruptcy Code provides that:
(a) The court shall grant the debtor a discharge, unless . ..
(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed
(A) property of the debtor, within one year before the date of the filing of the petition; or
(B) property of the estate, after the date of the filing of the petition.

. A Chapter 11 debtor-in-possession owes a greater duty of disclosure than the typical Chapter 7 debtor, as the debtor-in-possession is serving as trustee for the bankruptcy and operating its business, an asset of the estate.

. Section 1107 of the Bankruptcy Code requires a debtor-in-possession to perform all of the duties of a trustee. Section 1106(a)(1), which describes the duties of a trustee, incorporates § 704(7). The bankruptcy court found *968 that the Scotts' interests in the business entities were property of the estate.

. Section 727(a)(3) of the Bankruptcy Code provides that:
(a) The court shall grant the debtor a discharge, unless ...
(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

. Also significant is that the estate lacked sufficient funds to undertake this enormous project.