**In re Jan Earl TAUBER and Kathy Lee Tauber, Debtors.**

**Buckeye Retirement Properties of Indiana, LLC, Plaintiff,**

v.

**Jan Earl Tauber, Defendant.**

**Bankruptcy No. 04–63413 JPK.**
**Adversary No. 05–6011.**

United States Bankruptcy Court, N.D. Indiana, Hammond Division.

Sept. 6, 2006.

Lambert C. Genetos, Esq., Kopko, Genetos & Retson, L.L.P., Merrillville, IN, for the Plaintiff.

Gordon E. Gouveia, Esq., Gouveia & Associates, P.C., Merrillville, IN, for the Defendant.

### MEMORANDUM OF OPINION AND ORDER

J. PHILIP KLINGEBERGER, Bankruptcy Judge.

On July 9, 2004, Jan Earl Tauber, along with his wife Kathy Lee Tauber, filed a petition for relief under Chapter 7 of the United States Bankruptcy Code. Subsequently, on January 20, 2005, Buckeye Retirement Properties of Indiana, L.L.C. ("Buckeye") filed an adversary proceeding

against Jan Earl Tauber (the "Debtor")[1], contending that the Debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(3), (a)(4), & (a)(5). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J) in which a bankruptcy court can enter a final judgement thereon, and venue before this Court is proper pursuant to 28 U.S.C. § 1409(a).

At a telephonic status conference held on June 29, 2005, the Court ordered the parties to file a joint stipulation of facts and set a trial date, at which time each party would have the opportunity to present evidence exclusive of the stipulation. A trial was held on October 6, 2005, and the parties were ordered to file post-trial briefs in support of their respective positions, which they did. The matter is now before the Court for final disposition.

The record before the Court is comprised of Buckeye's complaint, Tauber's answer to that complaint, the stipulation filed on October 3, 2005 (including certain documents attached thereto), and the trial record. The pertinent facts from the stipulation are the following:[2]

1. On July 9, 2004, the Defendant, Jan Earl Tauber, filed a Petition for Relief under Chapter 7 of the Bankruptcy Code [a copy of the petition and schedules, and all amendments thereto are attached to the stipulation and are deemed by the Court to be part of the record]. {Stipulation ¶ 3}.

2. Buckeye does not object to the discharge of Kathy Lee Tauber. {Stipulation ¶ 5}.

3. The Defendant's Schedule F lists Buckeye Retirement Properties of Indiana, LLC, as successor in interest to South Holland Trust and Sav-

ings, Plaintiff herein, as having a claim based on a personal guarantee of Jan Tauber for Metal Manufacturing Co. and Sinusoidal, LLC. {Stipulation ¶ 7}.

4. Defendant was a 50% shareholder of A–Bust Tool and Manufacturing Co., Inc. d/b/a Metal Manufacturing Co. ("Metal Mfg.") at the time of the filing of his bankruptcy petition. {Stipulation ¶ 8}.

5. Defendant in his original Schedule F listed Metal Mfg. as an unsecured creditor for $243,270.00 for shareholder loans. {Stipulation ¶ 9}.

6. Defendant in his Amended Schedule F filed on October 18, 2004, lists Metal Mfg. as an unsecured creditor for $243,269.83 for loans incurred in 2003. {Stipulation ¶ 10}.

7. The Statement of Financial Affairs filed by Metal Mfg., in its Chapter 11 bankruptcy proceeding Case No. 04–64206 states that the Defendant received $35,000.00 in shareholder loans between September 1, 2003 and August 31, 2004. {Stipulation ¶ 11}.

8. Defendant did not list in his Statement of Financial Affairs his gambling winnings or losses during the two years immediately preceding the commencement of his bankruptcy proceedings. Winnings of $67,400.00 in 2002 and $27,240.00 in 2003. {Stipulation ¶ 12}.

9. Defendant in Schedule J states that his monthly rent was $800.00. {Stipulation ¶ 13}.

10. Checks of the Defendant and/or his wife payable to the owner of the property where Defendant resided for the months preceding the filing

---

1. Buckeye did not file a complaint against the co-debtor, Kathy Lee Tauber.

2. The Court will address further facts later in the opinion.

of Defendant's bankruptcy petition were in the amount of $622.00. {Stipulation ¶ 14}.

11. The Debtor's background includes a high school education and significant practical production and sales experience in the steel industry. {Stipulation ¶ 18}.

12. The Debtor's business experience includes 20 years in sales at Bendix Corporation, 8 years in sales with Farrel Corporation (overlapping) and 24 years working at A–Bust Tools & Manufacturing, Co., as Vice President with his primary responsibilities including machine set-up, personnel supervision and sales. {Stipulation ¶ 19}.

13. Copies of the Debtor's 2002 and 2003 Federal Income Tax returns are included in the record. {Stipulation ¶¶ 20 and 21}.

14. Debtor paid one month rent to Burgess, LLC in February 2004, prior to the filing of this bankruptcy petition, but he had no written lease with Burgess, LLC when he filed this chapter 7 bankruptcy petition. {Stipulation ¶ 22}.

15. The transcript of the Plaintiff's 2004 exam taken of the Debtor on November 23, 2004 is included in the record. {Stipulation ¶ 25; Exhibit "8" to the stipulation}.

16. Copies of Bank Calumet account number 000352994 of Jan and Kathy Lee Tauber for the months of September 2003 through June 2004 are included in the record. {Stipulation ¶ 26; Group Exhibit "9"}.

17. A copy of Metal Mfg. Co. general ledger for the period September 1, 2003 through August 31, 2004 is included in the record {Stipulation ¶ 27; Exhibit "10" to the stipulation}.

18. Copies of casino markers paid by Jan Tauber on behalf of Kathy Lee Tauber between September 2003 and June 2004 are included in the record. {Stipulation ¶ 28; Group Exhibit "11" to the stipulation}.

*See, Stipulation Of The Parties On Complaint Objecting to Discharge Pursuant to 727(a)* (the "Parties' Stipulation") at ¶s 3–28.

The crux of Buckeye's complaint is that the Debtor's discharge should be denied under § 727(a)(3) for failing to maintain or preserve books and records relating to loans made by A–Bust to the Debtor; that discharge should be denied under § 727(a)(4) due to the Debtor's improperly stating the amount of rent being paid on a monthly basis, understating employment income for 2003, not claiming gambling winnings for certain years, not listing a safe-deposit box, and for not listing a pre-petition lease agreement; and finally that discharge should be denied under § 727(a)(5) due to the Debtor's failure to satisfactorily explain the loss or deficiency of assets to meet his liabilities with respect to the A–Bust loans.

## DISCUSSION

 The denial of a debtor's discharge is akin to financial capital punishment. It is reserved for the most egregious misconduct by a debtor. As the Seventh Circuit Court of Appeals has stated:

The purpose of the Code is to provide equitable distribution of the debtor's assets to the creditors and "to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." *Williams v. United States Fid. & Guar. Co.,* 236 U.S. 549, 554–55, 35 S.Ct. 289, 59 L.Ed.

713 (1915). We construe the Bankruptcy Code "liberally in favor of the debtor and strictly against the creditor." *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir.1997); *In re Reines*, 142 F.3d 970, 973 (7th Cir.1998); *In re Adlman*, 541 F.2d 999, 1003 (2d Cir.1976); 11 U.S.C. § 727(a) (providing that, "the court shall grant the debtor a discharge, unless ..."). Thus, consistent with the Code, bankruptcy protection and discharge may be denied to a debtor who was less than honest. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) ("But in the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.' ") (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)); *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 674 (7th Cir.1995) ("Congress concluded that preventing fraud is more important than letting defrauders start over with a clean slate, and we must respect that judgment."). If a creditor demonstrates by a preponderance of the evidence that the debtor actually intended to hinder, delay, or defraud a creditor, the court can deny the discharge. *See Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir.2000); *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966–67 (7th Cir. 1999); *cf. Grogan*, 498 U.S. at 286–87, 111 S.Ct. 654. The intent to defraud must be actual and cannot be constructive; however, because it is unlikely that the debtor will admit fraud, intent may be established by circumstantial evidence. *See In the Matter of Krehl*, 86 F.3d 737, 743–44 (7th Cir.1996); *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 566 (7th Cir. 1989).

*Village of San Jose v. McWilliams*, 284 F.3d 785, 789–790 (7th Cir.2002).

■ This Court does not take lightly a creditor's, or for that matter a Trustee's, request for the outright denial of a discharge. In fact, it is within the discretion of a bankruptcy court to grant a discharge even when grounds exist for the denial of a discharge. *Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 901 (7th Cir.2002) (*citing, In re Hacker*, 90 B.R. 994, 997 (Bankr.W.D.Mo.1987)). But, although a denial of a discharge "should be construed liberally in favor of a debtor," a discharge is a privilege and not a right; *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir.1996).

■ The standard of proof for determining whether a discharge should be withheld pursuant to 11 U.S.C. § 727(a) is by the preponderance of the evidence. *Peterson v. Scott, et al.*, 172 F.3d 959, 966 (7th Cir.1999). At trial, there is a burden shifting process similar to the procedure found in Title VII cases. *See, McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *In re Martin*, 698 F.2d 883, 887 (FN.4) (7th Cir.1983).

It is true that the parties, and the authorities, are agreed that the *ultimate* burden of proof in a proceeding objecting to a discharge lies with the plaintiff. Rule 406, Rules of Bankruptcy Procedure, Bkr.-L.Ed., *Rules Commentary and Analysis* § 5:216 (1979). It is also clear, however, that while the plaintiff has the ultimate burden of persuasion in this type of proceeding, the burden of going forward with the evidence is not necessarily similarly assigned. Advisory Committee Notes, Rule 407, Rules of Bankruptcy Procedure. *See, e.g., In re Martin*, 554 F.2d 55, 58 (2d Cir.1977) ("Regardless where the ultimate burden of persuasion lies, assignment of the ini-

tial burden of production depends on the circumstances."); *In re Gem Sleepwear Co.*, 461 F.Supp. 644 (S.D.N.Y.1978); *In re Magnusson*, 14 B.R. 662 (Bankr. N.D.N.Y.1981). The Advisory Committee Notes leave to the courts "the formulation of rules governing the shift of the burden of going forward with the evidence in the light of such considerations as the difficulties of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the bankrupt than to the objector." Advisory Committee Notes, Rule 407, Rules of Bankruptcy Procedure.

While the ultimate burden of proof may rest on the creditors, we think that sufficient evidence was presented by the creditors in this case to satisfy their burden of first going forward with the evidence, and that the burden thereafter of producing additional evidence was shifted to the debtor ... The creditor's proof as to the debtor's actions, while perhaps insufficient to satisfy the ultimate burden of persuasion in the face of a credible explanation by the debtor, is sufficient in this case to shift to the debtor an obligation to come forward with such an explanation of his actions. Unless and until the debtor could provide such a credible explanation, a discharge should have been denied under the continuing concealment provisions of section 727(a)(3).

*Id.*

With these principles in mind, the Court will analyze in kind each provision of the Code which Buckeye alleges forms the basis for the denial of Tauber's discharge.

### 11 U.S.C. § 727(a)(3)

In order to prevail under this section, the plaintiff must show:

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

 The interests protected by § 727 "are those of creditors and that the [debtor] is required to take such steps as ordinary fair dealing and common caution dictate to enable creditors to learn what [the debtor] did with the estate." *Collier on Bankruptcy*, ¶ 727.02(1) (15th Ed. Rev.). Any act or omission must be by the debtor or by someone for whom the debtor is legally responsible; *Collier on Bankruptcy*, ¶ 727.03(2) (15th Ed Rev.). If the debtor appoints an agent to perform such duties, then the debtor is responsible for any failure to keep or maintain adequate records. *Id.* The focus is whether the debtor should be held responsible in light of all the relevant circumstances. *See, In re Cox*, 904 F.2d 1399 (9th Cir.1990) (held, when a married couple shared a duty to keep records, a bankruptcy court abused its discretion by refusing to consider one spouse's reliance on the other as a justification for the spouse's failure to keep records.).

 If the debtor is a sophisticated business person, and the debtor's bankruptcy case *directly involves the debtor's business in relation to creditors of the debtor*, there is a higher standard. *See e.g., Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 900 (7th Cir.2002) ("Where *debtors* are sophisticated in business, and *carry on a business involving significant assets*, creditors have an expectation of greater and better record keeping.") (*citing, Peterson v. Scott*, 172 F.3d 959 (7th Cir.1999)). (Emphasis supplied).

The Seventh Circuit has defined definite parameters for a matter brought pursuant to § 727(a)(3):

Section 727(a)(3) requires as a precondition to discharge that debtors produce records which provide creditors "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *In re Martin,* 141 B.R. 986, 995 (Bankr.N.D.Ill.1992); *In re Kearns,* 149 B.R. 189, 190–91 (Bankr.D.Kan.1992); *see also Meridian Bank v. Alten,* 958 F.2d 1226, 1230 (3d Cir.1992); *In re Cox,* 904 F.2d 1399, 1402 (9th Cir.1990). The provision ensures that trustees and creditors will receive sufficient information to enable them to "trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions." *In re Martin,* 141 B.R. at 995; *see also In re Shapiro,* 59 B.R. 844, 848 (Bankr. E.D.N.Y.1991); *In re Pimpinella,* 133 B.R. at 697; *In re Frommann,* 153 B.R. at 116. Records need not be kept in any special manner, nor is there any rigid standard of perfection in record-keeping mandated by § 727(a)(3). *Meridian Bank,* 958 F.2d at 1230; *In re Underhill,* 82 F.2d 258, 259–60 (2d Cir.), *cert. denied,* 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402 (1936); *In re Zell,* 108 B.R. 615, 627 (Bankr.S.D.Ohio 1989); *In re Schultz,* 71 B.R. 711, 717 (Bankr.E.D.Pa. 1987); *In re Graham,* 111 B.R. 801 (Bankr.E.D.Ark.1990). On the other hand, courts and creditors should not be required to speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs. *In re Frommann,* 153 B.R. at 117; *In re Pimpinella,* 133 B.R. at 698; *In re Shapiro,* 59 B.R. at 848.

*In re Juzwiak,* 89 F.3d 424, 427–28 (7th Cir.1996)

As far as establishing the requisite intent is concerned, the Seventh Circuit has stated:

Section 727(a)(3) does not require proof of criminal or quasi-criminal conduct; rather, a transfer or removal of assets, a destruction or other wasting of assets, or a concealment of assets is all the trustee must prove. Concomitantly, intent is not an element of proof under § 727(a)(3). *See, e.g., In re Juzwiak,* 89 F.3d 424, 430 (7th Cir.1996) ("creditors do not need to prove that the debtor intended to defraud them in order to demonstrate a § 727(a)(3) violation").

*Peterson v. Scott, et al.,* 172 F.3d 959, 969 (7th Cir.1999).

Also, there is a fairly high standard as to the *types* of records which are sufficient to satisfy § 727(a)(3), especially if the debtor himself/herself/themselves was/were a business entity:

Many courts faced with checking account records, canceled checks, deposit slips, bank statements, and tax returns as the sole documentation of a debtor's financial history and condition have determined that such records are inadequate under § 727(a)(3). *See, e.g., In re Frommann,* 153 B.R. at 117–18 (carton of bills, checks, bank statements, closing statements and tax returns insufficient to determine debtor's financial condition); *Vetri v. Meadowbrook Mall Company,* 174 B.R. 143, 146 (M.D.Fla.1994) (bank statements, canceled checks and deposit slips not identifying source of funds inadequate); *In re Pimpinella,* 133 B.R. at 696–698; *In re Schultz,* 71 B.R. at 717; *In re Morando,* 116 B.R. at 15; *In re Shapiro,* 59 B.R. at 848; *In re Vandewoestyne,* 174 B.R. 518, 522–23 (Bankr.C.D.Ill.1994). We recognize that

in some situations (such as where there is no business activity involved or the number of transactions is extremely limited) the type of records submitted by Juzwiak may be sufficient to enable creditors to trace financial transactions and evaluate the debtor's financial condition. *See, e.g., In re Becker,* 74 B.R. 233, 236–37 (Bankr.E.D.Tenn.1987) (bank statements and canceled checks in addition to detailed spreadsheets prepared by accountant sufficient). The instant case, however, clearly does not involve such a situation. Juzwiak ran a business enterprise engaged in a steady stream of large scale transactions involving substantial sums of money.

*Juzwiak,* 89 F.3d at 429.

Additionally, even if the debtor maintains a complete set of records, the requirements of § 727(a)(3) may *still* not be met if the records were not "preserved":

Also, the existence of a complete set of records does not necessarily satisfy § 727(a)(3); both statute and case law support this conclusion. Section 727(a)(3) provides that a debtor be denied a discharge if he has "failed to keep or preserve any recorded information ... from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." In this context, "keep" and "preserve" are not synonyms. "Keep" has the same meaning it would have in phrases such as "to keep a diary" or "to keep a record," that is, to maintain a record by entering it in a book. Otherwise, the repetition of the word "preserve" is superfluous, a disfavored result. *See, e.g., Mackey v. Lanier Collection Agency & Serv.,* 486 U.S. 825, 837 & n. 11, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (statute should be interpreted to give meaning to every word) (collecting cases). Also, the text

of the statute does not merely require that the debtor not lose any records; rather, it authorizes denial of discharge where the debtor "fails to act" unless the "failure to act" is justifiable. This language places an affirmative duty on the debtor to create books and records accurately documenting his business affairs. *Juzwiak,* 89 F.3d at 429 ("The debtor has the duty to maintain and retain comprehensible records.") (citations omitted). The debtors maintained a computer database of their various transactions, and perhaps this would have allowed the trustee to ascertain their financial condition and business transactions. However, this database became unusable before Peterson was appointed trustee.

The purpose of § 727(a)(3) is " 'to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs.' " *Cox v. Lansdowne (In re Cox),* 904 F.2d 1399, 1401 (9th Cir.1990) (*quoting In re Underhill,* 82 F.2d 258, 260 (2d Cir.1936)). This statute "ensures that trustees and creditors will receive sufficient information to enable them to 'trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions.' " *Juzwiak,* 89 F.3d at 427–28 (citation omitted). In the absence of § 727(a)(3), debtors without proper books and records could obtain a discharge while frustrating a trustee's ability to liquidate prepetition assets to satisfy prepetition debts. "Creditors are not required to risk the withholding or concealment of assets by the bankrupt under cover of a chaotic or incomplete set of books or records." *Cox,* 904 F.2d at 1401 (*quoting Burchett v. Myers,* 202 F.2d 920, 926 (9th Cir. 1953)).

*Scott,* 172 F.3d at 969.

The foregoing authorities appear to establish an extraordinarily high standard

for record keeping for a debtor—frankly a standard which the author's own practices would not meet were the author to have *engaged in a business enterprise* and then had to file a bankruptcy case when it failed. When determining the requisite standard from the foregoing cases, one must keep two things in mind. First, the standard has been imposed *ex post facto* on debtors whose *business affairs* were the subject of scrutiny in a bankruptcy case; the elaborate record keeping requirements are not required by laws, rules or regulations which were applicable to a debtor's affairs before he/she/they came under the microscope of a trustee's or a creditor's examination in a bankruptcy case. Secondly, the foregoing standards were stated with respect to cases **in which the debtor himself/herself/themselves was/were engaged in a** *business,* the operations of which became the focus for matters relating to the assets and liabilities of the debtor in a case. For example, in *In re Juzwiak, supra.,* the debtor operated a grain hauling business, Juzwiak Trucking, from 1988 to 1993. The grain was obtained from five suppliers and resold to about three regular buyers. In January of 1993, the debtor began purchasing grain from Cargill, and by October of that same year approximately $203,714.92 in checks written to Cargill by the debtor had been dishonored. Soon thereafter the debtor opened a new checking account and ceased making deposits into the overdrawn account. Eventually, the debtor filed bankruptcy and Cargill objected to the discharge pursuant to 707(a)(3). At trial, the debtor testified that he ran all his business through a single checking account and that all grain sale proceeds were deposited into the account and made all purchases from that same account. The debtor alleged he was able to track sales by way of the deposit slips and could track expenses through copies of checks. Each year the debtor would organize this information and summarize it in a notebook, which would be turned over to the accountant. However, the only records the debtor turned over during the bankruptcy were account ledgers, canceled checks, deposit slips, bank statements and his 1993 tax returns—not the notebook summaries. The appellate court noted that the records did not reflect the source of funds deposited into the account:

> In other words, the deposit slips do not identify who the money came from, nor do they indicate how much grain was purchased at what price. The documentation also fails to disclose which business supplied the grain sold. In addition, the records do not include substantiation of Juzwiak's business expenses and his checks to grain suppliers do not detail how much grain was purchased at what price. Further, Juzwiak submitted no records documenting employee payroll deductions or payroll taxes.

*Juzwiak,* 89 F.3d at 426.

The Seventh Circuit held that the records produced did not satisfy the debtor's burden under § 727(a)(3)—*Id.* at 428—because the records produced did not enable the creditor to reconstruct the debtor's grain sale transactions or track the debtor's financial dealings "for any period of time with any degree of completeness or accuracy." *Id.*

> Primarily, this is because the deposit slips and other checking account records do not disclose the source of the funds deposited and additionally because there is no substantiation of expenses. The bankruptcy court found that the source of deposits was not recorded or determinable from the records disclosed. Without invoices detailing how much grain was sold to whom for how much

and where the grain came from, Cargill was left to speculate as to what happened to the grain it sold to Juzwiak, as well as to the nature and composition of Juzwiak's other grain sale transactions. This is not acceptable under § 727(a)(3). Additionally, Cargill was hindered in verifying and tracing Juzwiak's disbursement of funds, since there was no documentation substantiating or explaining his expenses and no payroll records. This process was further complicated because Juzwiak occasionally paid personal expenses out of the business account. Although Juzwiak did furnish a lot of paper to Cargill and the court, the disorder and nature of the records did not allow meaningful reconstruction of Juzwiak's business transactions. *In re Frommann*, 153 B.R. at 118; *see also In re Pimpinella*, 133 B.R. at 699.

*Id.*

The Court aptly reasoned:

First, the burden is not on the creditor to organize and reconstruct the debtor's business affairs. *See Frommann*, 153 B.R. at 117–18; *In re Pimpinella*, 133 B.R. at 698; *In re Morando*, 116 B.R. at 16; *In re Shapiro*, 59 B.R. at 848. The debtor has the duty to maintain and retain comprehensible records. *In re Frommann*, 153 B.R. at 118; *In re Vandewoestyne*, 174 B.R. at 522. Creditors are not required "to sift through documents and attempt to reconstruct the flow of the debtor's assets." *In re Frommann*, 153 B.R. at 118; *In re Pimpinella*, 133 B.R. at 699; *see also In re Morando*, 116 B.R. at 16; *In re Hughes*, 873 F.2d 262, 264 (11th Cir.1989). As we stated in another context, in referencing § 727(a)(3):

"Creditors should not be forced to undertake an independent investigation of a debtor's affairs; rather they have a right to be 'supplied with dependable information on which they can rely in tracing a debtor's financial [* *16] history.' Section 727 makes complete financial disclosure a 'condition precedent' to the privilege of discharge . . . ."

*United States v. Ellis*, 50 F.3d 419, 425 (7th Cir.) (internal citations omitted), *cert. denied*, 516 U.S. 849, 116 S.Ct. 143, 133 L.Ed.2d 89 (1995). Therefore, the bankruptcy court erred in holding § 727(a)(3) was satisfied because Cargill could have organized Juzwiak's records, hired an accountant, and interviewed Juzwiak or obtained missing information from Juzwiak's customers. [n2]

n2. Juzwiak argues that if we affirm the district court's decision and deny Juzwiak a discharge, "just about every small business" and unsophisticated businessperson would be precluded from obtaining a discharge because they cannot afford to hire a bookkeeper or an accountant. **However, our decision today simply requires businesses to maintain adequate invoices of sales along with documentation substantiating business expenses. This does not require an accountant or a bookkeeper. The debtor must merely keep the primary documents disclosing his business transactions.** Both expert accountants testified that even their small clients typically keep such records, and that, in fact, the IRS requires such documentation. Thus, Juzwiak's argument does not give us pause.

*Id.* at 429–430. (Emphasis supplied).

Similarly, in the matter of *Peterson v. Scott, et al.*, 172 F.3d 959 (7th Cir.1999), the Scott family—comprised of a father and two sons—made extensive investments and real estate purchases and at one time controlled more than 70 corporations, partnerships or limited partnerships. In order to finance these projects, the Scotts would solicit investors and charge a management fee—26% of the initial investment and 5% per year thereafter. More often than not, this money was paid to IRE Services, Inc., an entity controlled by the Scotts and setup primarily to manage the numerous other entities they owned and controlled.

Each debtor proposed a plan of reorganization that would pay their unsecured creditors, who were owed 14 million dollars, a pro-rata share of $25,000. The disclosure statements filed with the court lumped the interests of all the business entities into one line and stated the value of their combined interest to be $142,000. Also, the debtors refused to provide any information concerning their interests in entities which were not in bankruptcy. Finally, a day before one of the debtors appeared for the § 341 meeting, it came to light that one of these entities had received $480,000. Ultimately, a Trustee was appointed to possibly convert this matter to a Chapter 7, which he eventually did, and filed a lawsuit to deny the debtors' discharge pursuant to, among other things, § 727(a)(3). Because the debtors' database, where they kept track of their business transactions, became unusable (along with the back-up disks) the Trustee had to trace thousands of transactions via written records. The other obstacle faced by the trustee was that:

> [T]he Scotts substantially disregarded independent corporate forms in managing their cash flow. As accounts receivable and investments were received, the Scotts would deposit the monies into one clearinghouse account, regardless of the money's source. They would also withdraw money from this account, and put it towards the most pressing expenses. The Scotts would then characterize the withdrawal as a loan between the business entities, or an advance to one of the Scotts, followed by a capital contribution (or another loan) to another corporation. The Scotts did not consider the financial condition or solvency of each business entity as they went through these machinations.

*Id.* at 964

As to keeping and preserving records the Court stated:

The purpose of § 727(a)(3) is " 'to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs.' " *Cox v. Lansdowne (In re Cox),* 904 F.2d 1399, 1401 (9th Cir.1990) (*quoting In re Underhill,* 82 F.2d 258, 260 (2d Cir.1936)). This statute "ensures that trustees and creditors will receive sufficient information to enable [\* \*28] them to 'trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions.' " *Juzwiak,* 89 F.3d at 427–28 (citation omitted). In the absence of § 727(a)(3), debtors without proper books and records could obtain a discharge while frustrating a trustee's ability to liquidate prepetition assets to satisfy prepetition debts. "Creditors are not required to risk the withholding or concealment of assets by the bankrupt under cover of a chaotic or incomplete set of books or records." *Cox,* 904 F.2d at 1401 (*quoting Burchett v. Myers,* 202 F.2d 920, 926 (9th Cir.1953)).

*Id.*

There are several other cases which the Court then used for comparison, including *In re Juzwiak.* However, the *Scott* Court acknowledged that the principal concern of § 727(a)(3) is debtors who destroy or conceal their records to keep complex transactions from scrutiny, but that most bankruptcies are consumer bankruptcies with no assets or business affairs to speak of and, as a result, "the complexity of their business transactions do not implicate § 727(a)(3)." *Id.* The Court clearly limited the detailed record keeping requirement imposed under 11 U.S.C. § 727(a)(3) to debtors who themselves are engaged in extensive business transactions in which all of their assets and liabilities are implicated, stating:

[W]here debtors are sophisticated in business, and **carry on a business involving significant assets,** creditors have an expectation of greater and better record keeping. *See Juzwiak,* 89 F.3d at 428. As the debtors in this case lost over $ 20 million, there might be grounds to question their level of sophistication. But as they solicited the investments made, set up the impenetrable financial maze and directly controlled both the flow of funds and the investment decisions of the business entities, we conclude that they should be held to a higher level of scrutiny than an ordinary debtor. Where debtors fail to maintain books and records from which their financial history and condition can be ascertained, they must be denied a discharge under 11 U.S.C. § 727(a)(3).

*Id.* (Emphasis supplied)

■ In this case, Buckeye contends that Tauber's discharge should be denied due to an alleged failure to maintain records as to the disposition of approximately $35,000 in loans, made by A–Bust to Tauber, for the time period between September 2003 to April 2004. It must initially be noted that, although the debtor is a principal and officer in the lender entity, the focus of the record keeping requirement in this case is *not* possible disposition of assets of the lender, but rather Buckeye's sense that Tauber has squirreled away some of the proceeds of these loans and not disclosed them in his personal Chapter 7 case. Thus, in terms of the stringent record keeping standards noted above, the disposition of the loan proceeds revolves about what Tauber did with the proceeds. In this context, Tauber is more akin to a consumer debtor's case, and the inquiry regarding records focuses not on intricate documentation of business transactions of Tauber, but simply on how did Tauber spend the loan proceeds over the course of time from the date of his receipt of them to the date of his filing his Chapter 7 case. In its proper context, the issue is the extent to which Tauber should have kept detailed records of his *personal* expenditures. In a very real sense, the records requirement with respect to Tauber in relation to his personal expenditures is no different than that which would be imposed on a consumer Chapter 7 debtor to account *by records* for his/her/their expenditure of $35,000 of inheritances, of lottery winnings, of proceeds of a sale of property, of commissions or bonuses—received in the year prior to filing of the bankruptcy case. The focus is on Tauber's personal life—not on documentation of business transactions. As a result, the heightened record keeping requirements imposed upon the debtors in *In re Juzwiak, supra.* and in *Peterson v. Scott, supra.,* do not apply in this case. In that light, the standard to be applied by the Court here must accommodate the myriad of circumstances which arise in Chapter 7 consumer cases in which debtors may be called upon to provide records of their ordinary life's comings and goings and of the expenditures made by them in their pursuit of their lives.

Starting from the point of view of regular record keeping by regular people in their regular lives, what should such a person be required to maintain and preserve to explain to a bankruptcy trustee, a creditor or a court how money was spent over the course of the one to several year period prior to the filing of a bankruptcy case? The answer is what one would expect a regular person, even one with some business background, to make and keep as the documented record of their lives.

■ Buckeye's principal contention is that Tauber failed to keep adequate records of his disposition of the approximately $35,000 of loan proceeds he received from

a closely held corporation during the year preceding his Chapter 7 filing. The focus of this contention is Tauber's keeping of records which document his personal expenditures, realizing that the standard to be imposed will apply to *all* Chapter 7 cases which come before this Court.

Turning first to the "burden shifting" analysis of the Seventh Circuit, has Buckeye established a *prima facie* case that one should have expected Tauber to have more detailed records than he has as to his **expenditures.** Buckeye's incantation of lack of records to document the disposition of a specific component of the net resources available to the debtor is misplaced. The loans received by Tauber from A–Bust were simply an additional resource utilized by the debtor, and there is no reason—either in fact or in law—to impose a standard upon Tauber which required him to record particular disposition of these loan proceeds to any greater extent than he must record his personal expenditures during the time of receipt of these proceeds. Based upon the record in this case, the Court finds that Tauber's records concerning the expenditure of money which came into his possession prior to filing bankruptcy to be in consonance with ordinary records kept by ordinary people—including lawyers, accountants, physicians and even more astute business people—to document the personal expenditures they have made. Buckeye has failed in its threshold burden.

But let's assume *in arguendo* that the burden has shifted to Tauber to explain his lack of records to document the expenditure of $35,000 more in resources in the year preceding the filing of his case than he had in years prior to that time. Tauber's trial testimony establishes a reason for extraordinary disposition of assets all too familiar to this Court in the context of personal bankruptcies: a gambling prob-

lem. The issue now becomes the records required of an ordinary person to document the loss of resources through gambling, and the possible gains from gambling. Large gains are not a problem when derived from single "hits": Form 1099 reporting by casinos creates the record for that longed-for but seldom realized experience. It is the pattern of the ebb and flow of a gambling addiction, and the documents required to record that tide, that are at issue here. The standard the Court adopts in this case will have repercussions in perhaps as many as 25% of the consumer bankruptcy cases filed in this Division.

What we are addressing in part in this case is the extent to which a person must be required to explain and document gambling winnings and losses, so that creditors and trustees and the Court can determine if the debtor has squirreled away net winnings rather than devote the fruits of his/her/their good fortune to payment of the just debts of his/her/their creditors. Although not well articulated by Buckeye, the focus of its § 727(a)(3) contention is not the documentation of losses, but rather the lack of documentation of winnings. Admittedly, Tauber has little if anything in the nature of documentation of gambling winnings. But the record establishes that the gambling "problem" in relation to this case isn't Jan Tauber's addiction—it's that of his wife. Buckeye has not challenged Kathy Lee Tauber's discharge, and thus apparently it is satisfied that her records as to gambling winnings and losses are adequate. Thus, in the context of this case, the § 727(a)(3) issue is narrowed further. It is: to what extent should an ordinary person be required to originate and preserve records of his/her spouse's gambling winnings and losses, so that when he/she alone files bankruptcy, the net increase/decrease of assets available to the debtor, or potentially available to the

debtor[3], can be documented by the records of the filing spouse. Buckeye gave Kathy a pass, presumably because she isn't personally liable to it, and as a result the principle before the Court with respect to documentation is as if Jan Tauber had alone filed a Chapter 7 case. Again, the Court determines that Buckeye has failed to establish a *prima facie* case that Jan Tauber should have originated and preserved records sufficient to fully document *his wife's* gambling winnings and losses. Tauber's testimony is uncontroverted and clear—he gambled little, and as a result he lost little and won little. The following excerpts from the record are instructive:

Q. Now in addition—let's start with the September 25, '03 statement. In addition to the statement itself, there are photocopies of checks; correct?

A. Yes.

Q. Your wife signed all of those; correct?

A. I don't do very many checks, but I do some. But on that page I hadn't signed any. Yes.

*Trial Transcript,* p. 16.

His wife was the one who seemed to have an apparent gambling problem, and at times the debtor had to make deposits because there were insufficient funds to cover the casino markers:

Q. And what was her source of money [for gambling]?

A. Just the household source, mine, ours.

Q. So out of the checking account, out of your joint checking account?

A. Yes, but also from me too personally that didn't go into the checking account. Sometimes she would say,

one of these markers is going to go into the bank, and I would know there's not enough money in the bank. I'd say, there's not enough money, Kathy. When does the marker go?

She would tell me, and then I would get the money and give her cash. I would go cash a check, some of the checks that I borrowed, give her the money, and she would go redeem the marker. So some of them are redeemed that way, and some of them I would say just go put money in the bank; it's too late. And then the marker would come in through the checking account.

Q. You said you would cash a check; what check would you cash?

A. Some of the money I borrowed from the company.

*Trial Testimony* at p. 13–14.

Moreover, as the testimony and evidence submitted to this Court shows—*all* the casino markers were signed by Kathy Tauber—the Debtor only marginally participated in the gambling activities. *Trial Transcript* at 11. Buckeye's contention is that a majority of the A–Bust loan proceeds went to cover certain gambling losses and that the Debtor should be denied his discharge for failing to keep a record accurately reflecting gambling winnings and losses. *See, Plaintiff's Brief* at 5.

The testimony regarding Tauber's keeping of records for his own limited gambling is:

Q. Okay. But there's—I mean, at the end of an evening, you didn't keep a record at the end of an evening or the next day as to what transpired at your last visit to the casino?

---

**3.** Not all spouses share the good stuff. There's some truth to the rubric of "what's mine is mine; what's yours is mine", and in terms of hitting the jackpot at the Casino, that old saw may have particular relevance.

A. No. You would know it; you would just know it. You wouldn't write it down.

*Trial Transcript* at p. 22, lines 3–7

Explaining the "system" for accounting for Kathy's losses, Tauber stated:

Q. What records would the—what records would you have kept to reflect the losses?

A. You keep all of the markers; you keep all of the winners; you figure out where the money came from that you usually gamble with the day that you won and wherever the money went that you won. So you can offset your winnings by calculating how much money you used to win the money. And that's acceptable to the IRS. And we always have enough of those that—we have a lot more papers, but that's acceptable to them, and that's the way you do it.

Q. Well, aren't some of the markers redeemed on the day that—

A. Sometimes they are, but you still have to pay the tax on them.

Q. But if the markers were redeemed that same day, they don't necessarily represent a loss.

A. Well, you can't represent the marker as a win. If you take a $2,000.00 marker and you win a $2,000.00—or $2200.00 win on a slot machine, well then you buy the marker back. You really only won 200. But as far as the government is concerned you won 2200.

So you have to pay federal—you have to pay state tax which you can't deduct against, and you have to offset your federal so the amount that you wind up with at the end of the day is zero. Because, you know, you also

play some cash. They accept the fact that you do that.

Q. If—if you always won and you always redeemed the markers at the end of the day, how would they know what you've lost if you say you can use the markers to reflect your losses?

A. Because you don't always win.

*Trial Transcript* at p. 19, lines 9–25 and p. 20, lines 1–14.

The foregoing is in relation to Kathy Lee Tauber's apparent gambling addiction, an inference sustained by the record which Buckeye has submitted nothing to refute. There is no federal tax law requirement that married couples must submit a joint return, and there is thus no legally compelled reason why a spouse must create and maintain records of his/her spouse's gambling winnings and losses. In addition, there is no legal requirement that an individual maintain a daily ledger of wins and losses at gambling. In this context, the Court will not adopt a record keeping standard for all of the consumer debtor gamblers who pass through its portals that requires them to document each gambling adventure in terms of a record of winnings and losses on a particular day. In addition, the Court finds that Tauber's explanation as to his reason for lack of detailed records is credible, and that he has explained the lack of records in a manner sufficient to defeat Buckeye's contentions in this context under § 727(a)(3). Although the evidence reflects that Tauber is an experienced businessman, this is a *consumer* bankruptcy in the context of § 727(a)(3). It would indeed be a stretch to hold that these transactions fall under the standards established by the Seventh Circuit in *Juzwiak, Union Planters Bank* or *Peterson.* The Court of Appeals established a rule for, and distinguished cases that involve, complex commercial transac-

tions, as opposed to relatively straightforward consumer cases which involve the type of transactions currently at issue.

Based upon the foregoing, in the absence of a requirement imposed by law applicable specifically to such a record keeping requirement, the Court will not impose on a debtor, who himself/herself may have gambling addiction issues, a duty to maintain a detailed win/loss diary, especially with respect to gambling matters relating to a non-debtor spouse.

One further issue should be addressed, although Buckeye made so little of it that it barely deserves mention. Taubers' original Schedule F stated that he was indebted to A–Bust for loans totaling $243,270, received through 2003. Schedule F was amended, apparently to state that the loans were received exclusively in a one year period prior to the filing of the case. The discrepancy has been explained, although the Schedules are hardly an exquisite example of proper preparation. The Court finds that the loans—with the exception of the $35,000 of loans received between September 1, 2003 and August 31, 2004—were received over an extended period, and that the $243,270 amount includes approximately $35,000 in loans received by Tauber in the year prior to his filing of his Chapter 7 case. It is one thing for the Court to determine that adequate records have been maintained, and adequate explanation given, as to the expenditure of $35,000 in the year prior to filing this case, as contrasted to the expenditure of $243,270 in the year prior to filing this case. However, the record establishes that the $243,720 amount covers an extended period, and the expenditure of this amount over that period does not require additional records apart from those would have kept by an ordinary person to document personal expenditures for the 13 or so years prior to his filing of a Chapter

7 case. There is no issue here under § 727(a)(3).

For the reasons stated above, Buckeye's request to deny the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(3) is denied.

### 11 U.S.C. § 727(a)(4)

Buckeye also seeks to deny the debtor's discharge pursuant to 11 U.S.C. § 727(a)(4)(A), which provides:

> (a) the court shall grant the debtor a discharge, unless—
>
> . . .
>
> (4) the debtor knowingly and fraudulently, in or in connection with the case—
>
> . . .
>
> (A) made a false oath or account;
>
> . . .

As stated in *In re Costello*, 299 B.R. 882, 894 (Bankr.N.D.Ill.2003):

> Pursuant to Bankruptcy Rule 4005, the plaintiff bears the burden of proving his objection to the debtor's discharge. Fed.R.Bankr.P. 4005. However, once a plaintiff has established that the acts complained of occurred, the burden of production shifts to the debtor who must then come forward with a credible explanation of his actions. *First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 887 (7th Cir.1983).

As further stated in *Costello, supra,* at 899–900:

> Section 727(a)(4)(A) provides that the court may not grant a debtor a discharge if: "(4) the debtor knowingly and fraudulently, in or in connection with the case-(A) made a false oath or account...." 11 U.S.C. § 727(a)(4)(A). The burden of proof lies with the objecting creditor to establish five elements:

(1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with intent to defraud; and (5) the statement related to the bankruptcy case in a material way. [*In re*] *Bailey*, 145 B.R. [919] at 926 [(Bankr.N.D.Ill.1992)]; *Bank of India v. Sapru (In re Sapru)*, 127 B.R. 306, 314 (Bankr.E.D.N.Y.1991). Although the burden of proof rests on the creditor at all times, the debtor cannot prevail if he is unable to offer credible evidence after the plaintiff has established a prima facie case. *Sapru*, 127 B.R. at 316 (citation omitted).

The purpose of § 727(a)(4) is to ensure that the debtor provides dependable information to those who are interested in the administration of the bankruptcy estate. *Madonia v. Hasan (In re Hasan)*, 245 B.R. 550, 554 (Bankr.N.D.Ill.2000); *Brandt v. Carlson (In re Carlson)*, 231 B.R. 640, 655 (Bankr.N.D.Ill.1999). The debtor must disclose all ownership interests he holds in property. *Allard v. Hussan (In re Hussan)*, 56 B.R. 288, 292 (Bankr.E.D.Mich.1985). " 'The trustee and creditors are entitled to honest and accurate signposts on the trail showing what property has passed through the [d]ebtor's hands during the period prior to his bankruptcy.' " *Id.*, quoting *Guardian Indus. Products, Inc. v. Diodati (In re Diodati)*, 9 B.R. 804, 807 (Bankr.D.Mass.1981). It is not the debtor's responsibility to decide which assets are to be disclosed to creditors; rather, his job is simply to address each question and answer it accurately and completely. *Id.* (citation omitted).

The first thing that an objecting creditor must establish is that the Debtor made a statement under oath. Bankruptcy schedules and statements of financial affairs constitute statements under oath. *Northeast Fed. Credit Union v. Garcia*

*(In re Garcia)*, 260 B.R. 622, 631 (Bankr.D.Conn.2001); *Senese*, 245 B.R. at 575 (finding that any statement made in a bankruptcy petition, schedule, or statement of financial affairs falls within the meaning of § 727(a)(4)(A)); *In re Bailey*, 53 B.R. 732, 735 (Bankr.W.D.Ky. 1985) (noting that a false oath may consist of a false statement or omission in a debtor's schedules). In addition, testimony at a Federal Rule of Bankruptcy Procedure 2004 Examination is a statement under oath under § 727(a)(4). *Garcia*, 260 B.R. at 631. A creditor must next show that the statements made by the debtor were false. Whether the debtor made a false oath within the meaning of *§ 727(a)(4)* is a question of fact. *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987); *Bailey*, 145 B.R. at 926. Filing bankruptcy schedules with material misrepresentations or omissions to mislead creditors about the debtor's financial situation constitutes a false oath. *Britton Motor Serv., Inc. v. Krich (In re Krich)*, 97 B.R. 919, 923 (Bankr.N.D.Ill.1988) (citation omitted). Although not every single item need be scheduled and valued, "there comes a point when the aggregate errors and omissions cross the line past which a debtor's discharge should be denied." *Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 360–61 (Bankr.N.D.Ill.2002) (citations omitted).

Further, a debtor cannot excise a false oath by making subsequent corrections to his bankruptcy petition. *Bensenville Community Ctr. Union v. Bailey (In re Bailey)*, 147 B.R. 157, 165 (Bankr. N.D.Ill.1992) (citation omitted) ("Subsequent voluntary disclosure through testimony or an amendment to the schedules cannot expunge the falsity of an oath."). Allowing a debtor to submit false schedules and then, on discovery, avoid the

negative consequences of his dishonesty by amending those schedules "is contrary to the spirit of the law which aims to relieve honest debtors only." *Hussan*, 56 B.R. at 293. " 'The operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive.' " *Rogers v. Boba (In re Boba)*, 280 B.R. 430, 435–36 (Bankr. N.D.Ill.2002), quoting *Payne v. Wood*, 775 F.2d 202, 205 (7th Cir.1985); *Mazer v. United States*, 298 F.2d 579, 582 (7th Cir.1962).

After the creditor has demonstrated that the debtor made false statements, he must establish that these statements were made knowingly and fraudulently. As in § 727(a)(2)(A), direct evidence of intent to defraud is seldom available. Fraudulent intent must be inferred from circumstantial evidence or by inferences based on a course of conduct. *Bailey*, 145 B.R. at 928; *Nat'l Post Office Mail Handlers, Watchmen, Messengers & Group Leaders v. Johnson (In re Johnson)*, 139 B.R. 163, 169 (Bankr. E.D.Va.1992). Moreover, if a debtor's bankruptcy schedules and statements indicate that the debtor is recklessly indifferent to the truth, the objecting creditor does not have to offer any additional evidence of fraud. *In re Johnson*, 139 B.R. at 166 (citation omitted) (noting that courts recognize that a reckless indifference to the truth is "the functional equivalent" of fraud); *Bailey*, 145 B.R. at 928 (citations omitted) ("The cumulative effect of a number of false oaths by the debtor with respect to a variety of matters establishes a pattern of reckless and cavalier disregard for the truth by the debtor."); *Calisoff v. Calisoff (In re Calisoff)*, 92 B.R. 346, 355 (Bankr.N.D.Ill.1988).

Finally, the creditor must show that the false statements made by the debtor relate materially to the bankruptcy case. A statement is considered material for purposes of § 727(a)(4) if it relates to the debtor's estate, involves the discovery of assets, or concerns the disposition of the debtor's property or his entitlement to discharge. *Williamson*, 828 F.2d at 251; *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984) (citations omitted); *Netherton v. Baker (In re Baker)*, 205 B.R. 125, 133 (Bankr.N.D.Ill.1997).

The foregoing standards were further illuminated in *In re Holstein*, 272 B.R. 463, 476–477 (Bankr.N.D.Ill.2001) as follows:

Count III, based on § 727(a)(4)(A) of the Code, is also sufficient to state a claim upon which relief may be granted. That section provides for denial of discharge where the debtor knowingly and fraudulently makes a false oath or account. In order to obtain relief under this provision, a creditor must establish that (1) the debtor made a statement under oath, (2) the statement was false, (3) he knew the statement was false, (4) he made the statement with intent to defraud creditors, and (5) the statement related materially to the bankruptcy case. *Keeney*, 227 F.3d at 685; *Legum v. Murray (In re Murray)*, 249 B.R. 223, 228 (E.D.N.Y.2000); *Painewebber Inc. v. Gollomp (In re Gollomp)*, 198 B.R. 433, 437 (S.D.N.Y.1996). A matter is material for these purposes if it bears a relationship to the debtor's business transactions or estate or leads to the discovery of assets, business dealings or existence or disposition of property. *Korte v. Internal Revenue Service (In re Korte)*, 262 B.R. 464, 474 (8th Cir. BAP 2001); *Murray*, 249 B.R. at 230; *Neugebauer v. Senese (In re Senese)*, 245 B.R. 565, 574 (Bankr.N.D.Ill.2000); *Sanders,*

128 B.R. at 972. The determination whether a false oath has been made is a question of fact, *Keeney*, 227 F.3d at 685, and the requisite intent may be inferred from the facts and circumstances. *Id.; Korte*, 262 B.R. at 474; *In re Dubrowsky*, 244 B.R. 560, 573 (E.D.N.Y.2000); *Senese*, 245 B.R. at 575. The intent to defraud may involve a material representation known to be false or, "what amounts to the same thing, an omission that you know will create an erroneous impression." *In re Chavin*, 150 F.3d 726, 728 (7th Cir.1998); *Keeney*, 227 F.3d at 685. The intent requirement is satisfied if there is a reckless disregard or indifference to the truth. *Chavin*, 150 F.3d at 728; *Keeney*, 227 F.3d at 686; *Senese*, 245 B.R. at 575.

■ The standards by which a statement or omission made by a debtor is reviewed for materiality require full disclosure by the debtor. "[T]he materiality of an omission is not lessened by the fact that the assets transferred may have been exempt. (citations omitted)"; *In re Wilson*, 290 B.R. 333, 337 (Bankr.C.D.Ill.2002). The purpose of § 727(a)(4)(A) is to ensure that adequate information is provided to those interested in the administration of the estate without the need of independent examination or investigation to verify its accuracy and completeness. *Holstein*, 272 B.R. at 478. The trustee and creditors are entitled to honest and accurate signposts on the trail showing what property has passed through the debtor's hands during the period prior to this bankruptcy. *In re Hussan*, 56 B.R. 288, 292 (Bankr. E.D.Mich.1985) *quoting In re Diodati*, 9 B.R. 804, 807 (Bankr.D.Mass.1981). As stated in *In re Moore*, 104 B.R. 473, 475 (Bankr.M.D.Fla.1989):

The defendants argued that the stock transfer was of no consequence because the stock itself had no value. It is no defense to an objection to discharge proceeding to assert that the information omitted concerned worthless business relationships or holdings. *In re Chalik (Chalik v. Moorefield)*, 748 F.2d 616 (11th Cir.1984). The trustee and creditors are entitled to judge for themselves what information is material to the bankruptcy administration. *Id.* at 618.

■ In light of the foregoing, when evaluating a case under this section the court looks at the following factors: 1) Debtor made a statement under oath, 2) The statement was false, 3) Debtor knew that statement was false, 4) The statement was made with a fraudulent intent, and 5) The statement related materially to the bankruptcy case. *In re Chavin*, 150 F.3d 726 (7th Cir.1998); *In the Matter of Agnew*, 818 F.2d 1284 (7th Cir.1987); *In re Costello*, 299 B.R. 882 (Bankr.N.D.Ill. 2003); *In re Holstein*, 272 B.R. 463, 476–77 (Bankr.N.D.Ill.2001); *In re Tripp*, 224 B.R. 95, 97–8, (Bankr.N.D.Iowa 1998). The burden of proof is upon the movant to establish the elements of § 727(a)(4)(A) by a preponderance of the evidence. *In re Davis*, 297 B.R. 555, 556 (Bankr.S.D.Ill. 2003) *citing Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ First, under the Bankruptcy Code, representations made by a debtor on the Schedules and Statement of Financial Affairs constitute a statement made under oath for the purposes of § 727(a)(4). *In re Costello*, 299 B.R. 882, 899 (Bankr.N.D.Ill. 2003).

Section 1746 if Title 28 [of the] United States Code, provides that in federal proceedings an unsworn declaration under penalty of perjury is a permissible substitute for, and has the same force and effect as, a verification under oath. This is reflected in the Official Bankruptcy Forms, which make provision for

unsworn declarations rather than formal verification. Section 727(a)(4) should be read as being equally applicable to such unsworn declarations.

*Collier on Bankruptcy,* ¶ 727.04 (15th Ed. Rev.)

This concept stems from the forms themselves, where the debtor declares that the schedules are "true and correct". *Id.* However, if items are omitted by mistake, or upon honest advice of counsel to whom all relevant facts are disclosed, the declaration should not be deemed willfully false. *Id.* (citing, *Gullickson v. Brown,* 108 F.3d 1290 (10th Cir.1997)); *In re Mascolo,* 505 F.2d 274, 277 (1st Cir.1974).

■■■ Next, the movant must show that the statements made by the debtor were false. Whether the debtor made a false oath within the meaning of § 727(a)(4) is a question of fact. *Costello,* 299 B.R. 882. In *Krich* court held that "filing bankruptcy schedules with material misrepresentations or omissions to mislead creditors about the debtor's financial situation constitutes a false oath." *In re Krich,* 97 B.R. 919, 923 (Bankr.N.D.Ill.1988). Following plaintiff's demonstration that the debtor made false statements, he must establish that these statements were made knowingly and fraudulently. Parallel to § 727(a)(2)(A), direct evidence of intent to defraud is seldom available. *Costello,* 299 B.R. 882; *Holstein,* 272 B.R. at 477 (the requisite intent may be inferred from the facts and circumstances); *In re Moore,* 104 B.R. 473, 474–75 (Bankr.M.D.Fla.1989) (because proof of actual intent is generally unavailable though direct evidence, courts have traditionally relied upon certain well defined badges or indica of fraud to presume fraudulent intent). The intent to defraud may involve a material representation known to be false or "what amounts to the same thing, an omission that will cre-

ate a false impression." *Holstein,* 272 B.R. at 477.

■■■ In *Tripp, supra.,* the court held that "fraudulent intent exists where one makes a representation knowing it to be false either with a view of benefitting oneself or misleading another into a course of action." *Tripp,* 224 B.R. at 98. According to *Tripp,* "an act is done fraudulently if done with intent to deceive or cheat any creditor, trustee or bankruptcy judge." *Id. citing U.S. v. Lerch,* 996 F.2d 158, 161 (7th Cir.1993). The *Tripp* court was faced with fascinating set of facts. Tripp was denied discharge because he failed to disclose in his schedules 14–15 pounds of marijuana which he possessed. The court stated that the debtors "knew they illegally possessed marijuana," and that being an asset, should have been disclosed. It thus concluded that debtors had fraudulent intent in failing to disclose their possession of marijuana. *Id.* at 99. In contrast, however, a false statement resulting from ignorance or carelessness does not rise to the level of knowing and fraudulent. *In re Espino,* 806 F.2d 1001 (11th Cir.1986); *See also, In re Varrasso,* 37 F.3d 760 (1st Cir.1994); *cf. In re Sholdra,* 249 F.3d 380 (5th Cir.2001).

■■■ The last requirement under § 727(a)(4)(A) is that false statements made by the debtor relate materially to the bankruptcy estate. A matter is material, for purposes of this section, if it bears a relationship to the debtor's business transactions or estate or leads to the *discovery of assets,* business dealings or existence or disposition of property. *Holstein,* 272 B.R. at 477 (allegations of debtor's continuing concealment of this transfer of assets to a third party); *Tripp,* 224 B.R. 95 (the value, although may be relevant, is not determinative of materiality—possession of marijuana, although worthless in hands of trustee, must nevertheless be dis-

closed); *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir.1992) (debtor's failure to disclose a state tax refund was material, even if the tax refund would have no value to creditors because of its exempt status); *In re Guajardo*, 215 B.R. 739, 742 (Bankr. W.D.Ark.1997) (debtors must report all property interests, even if they are worthless or unavailable to creditors).

■ The Eleventh Circuit has held that value is immaterial in determining materiality of non-disclosure. The court noted that "the trustee and creditors are entitled to judge for themselves what information is material to the bankruptcy administration." *In re Chalik*, 748 F.2d 616 (11th Cir.1984). Meaning, "it is no defense to an objection to discharge proceeding to assert that the information omitted concerned worthless business relationship or holding." *Moore*, 104 B.R. at 475. In a similar vein, not every false oath is sufficient to deny discharge. *In re Hall*, 258 B.R. 908, 913 (Bankr.N.D.Ind.2001) (although the debtor falsely testified concerning his prior bankruptcy, this false testimony was not material because, had he testified truthfully, it would not have made any difference to the outcome of the proceeding or to the parties' rights). However, as commentators have pointed out:

> Even if the debtor can show that the assets were of little value or that a full and truthful answer would not have directly increased the estate assets, a discharge may be denied if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's pre-bankruptcy dealing and financial condition. Similarly, if the omission interferes with the possibility of a preference or fraudulent conveyance action the omission may be considered material. But a false statement that has no effect

in the case is not ground for denying a discharge.

*Collier on Bankruptcy*, ¶ 727.04 (15th Ed. Rev.)

■ With the foregoing standards in mind, Buckeye contends that under § 727(a)(4) the Debtor's discharge should be denied for: (1) improperly stating the amount of rent being paid on a monthly basis; (2) understating employment income for 2003; (3) over-stating certain medical and dental expense; (4) not claiming gambling winnings for certain years; (5) not listing a safe-deposit box; and (6) not listing a pre-petition lease agreement.

First, to the most obvious, no evidence was submitted to this Court that the debtor had a safe deposit box pre-petition and failed to list it; therefore, Buckeye's complaint fails as to this allegation.

As to the remaining allegations, Buckeye has failed to show that there were material omissions made by the debtor with an intent to defraud. In other words, there is no evidence that the debtor was recklessly indifferent to the truth or wished to create an erroneous impression in order to deceive or cheat the creditors or the trustee. For every issue raised by Buckeye under this section, the Debtor has a reasonable and plausible explanation.

In its brief, Buckeye makes much of the fact that $1,000 was paid out of the Debtor's personal account to Burgess, L.L.C. for rental of a building where Hoosier Roll Shop now operates. Buckeye, in its brief, then queries the Court, "How much of a coincidence can exist before the Court starts to question whether the Defendant made a false oath or account." Buckeye's argument throughout these proceedings has been that the debtor failed to list a lease he had with Burgess, L.L.C.—the evidence adduced at trial establishes on this record that there was no such lease.

It was Buckeye's burden to come forward with evidence at trial, and it failed to show that a lease existed.

Next, concerning the allegation that the Debtor over-stated his rent. At trial, the Debtor provided the Court with a logical explanation which was far from fraudulent. On cross-examination, by his attorney, the Debtor testified:

Q. Do you recall any other testimony you had at the time [of the 341 meeting]?

A. I think he did ask me about the rent come to think of it.

Q. And what explanation did you give—

A. It's been a year ago.

Q. What explanation did he give you—did you give him?

A. I think I gave him the same one that the taxes were changing and that I'm going to have to pay more rent. And that's what the landlord wanted and the same as I since testified.

*Trial Transcript* at 40.

The difference in the actual rent, and what was listed on the schedules, was approximately $188.00—the rent did go up a little but not to $800.00; however the Debtor agreed to be responsible for the full amount of the property taxes. *Id.* at p. 26–27. Because the Debtor was under the impression his rent was increasing shortly after the petition date, he so reflected that fact in his schedules—this is a far cry from fraud.

Similarly, the Court is satisfied with the Debtor's explanation as to his failure to list the gambling losses and winnings/understatement of 2003 employment income (as a result of gambling) on the Statement of Financial Affairs:

Q. Was there any time within the two years that we're talking about, 2003 to 2004, prior to the time you filed your bankruptcy that your—the money that you and your wife were able to bring back from the boats exceeded the amount of money that you lost there?

A. Over a period of—no, it didn't.

Q. Did the gambling losses always exceed the winnings and/or the cash that you would have brought home in terms of the loss that your wife had?

A. Yes.

*Trial Transcript* at p. 40–41.

The Debtor also testified that because the gambling losses/wins were reported on his tax returns, and because losses exceeded winnings, it was not necessary to schedule the same. This is apart from the material fact that in relation to this adversary proceeding, the majority of the gambling was done by his wife, not by the debtor. Again, as to this allegation and the debtor's response, the Court is hard-pressed to see even a faint shimmer of fraudulent intent on the part of the debtor/defendant.[4]

As to the alleged over-statement of certain medical and dental expenses, not much was made of it at trial or in Buckeye's brief. There was no concrete evidence of the actual amount of expenses incurred in relation to those stated. The

---

4. By this finding, the Court does not give a pass to the disclosures required to be made by a debtor in a Statement of Financial Affairs, even in a joint case when the required disclosure relates to only one of the joint filers. This finding is limited to the issues and the record in this case. In this case, whatever failure to disclose existed is either not material under 11 U.S.C. § 727(a)(4), or was rendered impotent by the record in the circumstances of this case.

foregoing representations, even if inaccurate, had no bearing on the outcome of these proceedings. *If proven by Buckeye* in conjunction with the application of the dreaded "means test", the overstatement of expenses might be material in relation to whether a Chapter 7 debtor should be a Chapter 13 debtor. However, apart from not proving falsity, the record establishes that there is no materiality to this contention.

Finally, Buckeye failed to prove any material understatement of Tauber's 2003 employment income.

Based upon the foregoing, Buckeye's request to deny the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4) is denied.

### *11 U.S.C. § 727(a)(5)*

Finally, Buckeye alleges that Tauber's discharge should be denied for failing to comply with 11 U.S.C. § 727(a)(5), which provides as follows:

> (a) The court shall grant the debtor a discharge, unless—
>
> * * *
>
> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

■ This section, in many ways, is "joined at the hip" with a claim brought under § 727(a)(3). *See, In re Hansen*, 325 B.R. 746 (Bankr.N.D.Ill.2005). This isn't too surprising—if there are no records then it may prove difficult for a debtor to craft an explanation as to the disposition of certain assets. § 727(a)(5) requires a satisfactory explanation which "must consist of more than … vague, indefinite, and uncorroborated" assertions. *Matter of D'Agnese*, 86 F.3d 732, 735 (7th Cir.1996) (*citing, Baum v. Earl Millikin, Inc.*, 359 F.2d 811, 814 (7th Cir.1966)). However, the explanation need not be highly detailed and comprehensive, but "must be more than a vague, indefinite, and uncorroborated hodgepodge of financial transactions." *Schechter*, 325 B.R. at 763. Notwithstanding this requirement, it has been stated:

> [A] debtor's explanation for the loss of assets can be satisfactory even without records corroborating the loss. *See Strzesynski v. Devaul (In re Devaul)*, 318 B.R. 824, 840 (Bankr.N.D.Ohio 2004) (noting that section 727(a)(5) itself says nothing about written corroboration and declining to hold "that an explanation must always be supported by records to be satisfactory"); *see, e.g., [In re] Olbur*, 314 B.R. [732] at 741–42 [(Bankr.N.D.Ill. 2004)] (deeming sufficient debtor's credible testimony about loss of contents of safe deposit box). The absence of records is always relevant, though, to the credibility of the explanation. *Devaul*, 318 B.R. at 840.

*Id.* at 765.

■ In other words, the debtor's explanation must be plausible enough to "eliminate the need for the Court to speculate as to what happened to all the assets." *Matter of D'Agnese*, 86 F.3d at 735. But the debtor does not need to justify the wisdom or prudence in the disposition of assets. *Schechter*, 325 B.R. at 763 (*citing, In re Hermanson*, 273 B.R. at 545 (Bankr. N.D.Ill.2002)); *see also, In re Von Behren*, 314 B.R. 169, 181 (Bankr.C.D.Ill.2004) (finding it irrelevant whether debtor's spending was "on illegal, immoral, or otherwise imprudent activities").

The Seventh Circuit has articulated the standard this Court must follow when evaluating a claim brought pursuant to § 727(a)(5):

> Under 28 U.S.C. § 727(a)(5), a bankruptcy court has "broad power to decline

to grant a discharge ... where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *In re Martin*, 698 F.2d 883, 886 (7th Cir.1983). In reviewing a bankruptcy court's decision to deny discharge, neither an appellate court nor a district court will overturn the decision unless it is clearly erroneous. FED. R. BANKR. P. 8013; *Martin*, 698 F.2d at 885. This standard applies both to subsidiary fact questions, such as whose version of events is correct, as well as to the ultimate question of whether the debtor has satisfactorily explained the loss of assets. *In re Volpert*, 175 B.R. 247, 264 (Bankr.N.D.Ill.1994). Further, "questions of credibility are solely for the trier of fact ... who has the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record." *United States v. Hatchett*, 31 F.3d 1411, 1417 (7th Cir.1994) (quotation omitted). *D'Agnese*, 86 F.3d at 734.

Proof under § 727(a)(5) is established as follows:

> Proof under section 727(a)(5) comes in two stages. *In re Martin*, 698 F.2d 883, 887 (7th Cir.1983). Although the objecting party always has the burden of proof, *id.*, that party meets its initial burden of going forward by showing that the debtor "at one time owned substantial and identifiable assets that are no longer available to his creditors," *Bostrom*, 286 B.R. at 364; *see also Martin*, 698 F.2d at 887; *Hermanson*, 273 B.R. at 545. If this showing is made, the burden then shifts to the debtor to offer a "satisfactory explanation" for the unavailability of those assets. *Hermanson*, 273 B.R. at 545 (internal quotation omitted); *see also Martin*, 698 F.2d at 887; *Bostrom*, 286 B.R. at 364.

*Schechter*, 325 B.R. at 763.

The standard for the debtor's explanation was discussed in *In re Martin*, 698 F.2d 883 (7th Cir.1983). In that case, a dispute arose as to the source of $15,000 used to purchase a condominium where the debtor lived, but was titled to a trust in which his father was beneficiary. The bankruptcy court found that the downpayment was made in three installments from the father's checking account and the source of those funds was from a money market account owned by the debtor. However, the contention was that these funds had been originally given to the debtor in *cash*, by his father, earmarked for the purchase of purchasing the condo. This transfer took place three months prior to the purchase and no explanation was given why this transfer was made so long before the purchase. The bankruptcy court granted the debtor's discharge and the trustee appealed. The Seventh Circuit stated:

> The case before us is clearly within the terms of section 727(a)(5). The debtor here made virtually no attempt to explain the transaction in question, and, indeed, presented no evidence after the creditors had put on their case-in-chief. The debtor instead chose to rely for his defense on the proposition that the creditors had not made out a prima facie case under their complaint. The debtor, however, essentially ignored paragraph 4 of the complaint filed by each of the appellants. This paragraph of the respective complaints asserts a claim which appears to come precisely within the reach of section 727(a)(5). While it would not constitute a prima facie case

under section 727(a)(5) to merely make an allegation of a failure to explain loss or deficiency of assets, *see* 4 *Collier on Bankruptcy* P 726.67 (L. King ed.1982), the creditors here have presented evidence which more than satisfies their burden of proof under this section. Accepting as we do the bankruptcy court's finding that the money used to buy the condominium was Ronald Martin's, there has been a "loss or deficiency" of substantial assets unaccompanied by any explanation from the debtor why such an unusual transaction occurred. In fact, the debtor's explanation, such as it is, seems to dig him deeper into a hole. Martin has persisted in maintaining that he received $15,000 cash from his father. This persistent effort at explanation makes it all the more difficult to accept the bankruptcy court's speculation that the condominium could have been intended as a gift from Ronald to his father. In any event, the creditors satisfied their burden of proof under section 727(a)(5), and we hold that the bankruptcy court should not have granted a discharge given the debtor's failure to satisfy his obligation under that section.

*Martin,* 698 F.2d at 886–87.

In commenting on the use of § 727(a)(5) in this particular case the court indicated:

The case before us is an excellent example of the type of situation contemplated by the Advisory Committee in its notes to Rule 407. It is clearly unsatisfactory to grant the debtor a discharge in a case such as this, where the debtor "stonewalls" the creditor and refuses to credibly explain to the court his puzzling or suspect transactions. The speculation of the bankruptcy judge or the creditors as to what may actually have been occurring is not an adequate substitute for a believable explanation by the debtor.

The evidence in this case which could satisfactorily explain the events in question is far more likely to lie in the hands of a debtor than of the creditor. The debtor presumably knows why what is usually a simple matter (either the purchase of a condominium or an intrafamily gift) has taken on such a byzantine character. To the extent that the debtor can explain these events he has an obligation to come forward and do so—he cannot abuse the bankruptcy process by obfuscating the true nature of his affairs and then refusing to provide a credible explanation.

*Id.* at 888.

Likewise, in the case of *Matter D'Agnese,* 86 F.3d 732 (7th Cir.1996) the debtor was accused, by a creditor, of failing to schedule certain assets she owned valued at an excess of $300,000. The debtor's explanation was that she had sold them to a friend of hers, but failed to provide any documentation or details of the transaction. Her ex-husband testified that he recalled some of these items being transferred, but had no knowledge as to the consideration, if any, for the transfers. As to the remainder of the items, the debtor claimed to have no knowledge of their whereabouts. The bankruptcy court denied the debtor's discharge and the Seventh Circuit affirmed, stating:

Title 11 U.S.C. § 727(a)(5) requires a *satisfactory* explanation for the whereabouts of a debtor's assets. Although the bankruptcy court did not specifically conclude that the debtor was lying, it found her statements "vague and uncorroborated" and therefore not adequate to explain the depletion in assets. The debtor's argument in this appeal depends upon her setting up a false dichotomy between explanations that are not credible and those that are satisfactory. The debtor's explanation, while

not necessarily a lie, was, nevertheless, not satisfactory. Under § 727(a)(5), a satisfactory explanation "must consist of more than ... vague, indefinite, and uncorroborated" assertions by the debtor. *Baum v. Earl Millikin, Inc.*, 359 F.2d 811, 814 (7th Cir.1966); *see also In re Bryson*, 187 B.R. 939, 955 (Bankr. N.D.Ill.1995). The debtor gave a vague and indefinite statement about the missing assets and she finally stated that she did not know what happened to some of the assets. Further, although the debtor claims that some items were transferred to Dzioba, the debtor fails to provide any testimony from Dzioba or documentary evidence to support the claim, even though the assets in question were of substantial monetary value. Thus, because the debtor failed to specify the whereabouts of the assets or provide any convincing evidence that the assets had been transferred to Dzioba, the bankruptcy court did not commit clear error in finding that the debtor's explanation was inadequate as a matter of law.

*Id.* at 735

 Buckeye's primary contention is that Tauber's discharge should be denied pursuant to § 727(a)(5) for failing to adequately explain the loss or deficiency of assets to meet his liabilities with respect to the A–Bust loan of approximately $35,000 in the year prior to the filing of the Chapter 7 case. There is a "throw-in" argument in the first paragraph on page 10 of Buckeye's post-trial submission that refers to the loans received by Tauber over the more that 10 year period prior to the filing of the Chapter 7 case. The evidence shows that from September 1, 2003 to August 31, 2004, Tauber received officer loans from A–Bust in the amount of $35,500.00. Prior to that, the Debtor had received officer loans in the amount of $207,769.83 over an extended period. The Debtor's salary for 2002 and 2003 was $83,200 and $89,028, respectively.

The trial record is devoid of any inquiry, by Buckeye, of the disposition of loans made prior to September 1, 2003.[5] Rather, at trial Buckeye's inquiry centered on the post-September 2003 loans and the purported gambling which caused the diminishment of these monies. The only mention of the $207,769.83 is the plaintiff's post-trial brief's statement that "[i]t is apparent that the Defendant has failed to satisfactorily explain loss or deficiency of assets. In addition to his salary, Defendant has 'borrowed' $243,269.83 from Metal Manufacturing, and his only explanation for its loss is his wife's undocumented gambling losses." *See, Plaintiff's Closing Argument* at pg. 10. Any argument that the Debtor has not adequately accounted for the $207,769.83 is somewhat misplaced—nothing was presented at trial which suggests that the Debtor was ever questioned about these monies and then failed or refused to account for its dissipation. The record does not establish any materiality for the throw-off contention by Buckeye on this issue.

As to the $35,500 the Court must determine whether the Debtor's explanation, as to the disposition of those assets, consists of more than just vague, indefinite and uncorroborated assertions and which eliminates the need for this Court to speculate as to what happened to the $35,500. At trial, Buckeye developed the fact that there was a loan, and that the Debtor either deposited the money in the bank or gave his wife cash to redeem gambling

---

5. Although not determinative of the issues addressed in this adversary proceeding, the Court notes that the Chapter 7 Trustee, who must be deemed to have full cognizance of the debtor's Schedules, didn't deem this to be an issue worthy of note.

markers—and that it is difficult to track the gambling wins/losses unless there are separate written records documenting each one. Beyond this, no further inquiries were made as to what happened to these funds, and **more significantly there is no evidence in the record to establish in any manner** that there's even a *wisp* of smoke somewhere from a fired revolver of the debtor's acquiring undisclosed assets with these loans. Tauber has testified that these funds were lost through gambling, credit card payments, and monthly living expenses. Given the evidence submitted, this explanation is plausible and satisfies the Court.

Again, after reviewing the record, this Court believes that the Debtor's wife has (or had) a potential gambling problem. Attached to the stipulation, submitted by the parties as Exhibit 11, are twenty-two pages of gambling markers from September 2003 to April 2004 which total $83,800.00. The following testimony is illuminating:

Q. If your—let's—we'll ask now with regard to your wife. If your wife did not have the money to redeem the marker at the end of an evening, how would that marker get paid?

A. In many cases it would go to the bank and come out of the checking account. And other cases she would gamble another day and redeem the marker. you can redeem the marker any time from the cage up to the time it goes to the bank, and so many times she would do that.

Q. Is—

A. Sometimes she would even take a marker to pay another marker. I don't know how many times, but some of those represent that.

*See, Trial Transcript* at pg. 13.

The "dissipation" of assets of which Buckeye complains is not only supported by the foregoing, but further by Tauber's Schedules I & J, which establish that the debtor was unable to pay for regular monthly living expenses, from his regular income, without there being a shortfall. Similarly, the bank statements, attached to the Parties' Stipulation as Exhibit 9, show that very little was left at the end of each month, if anything at all—and that the Debtors were at least attempting to pay down almost $90,000.00 in credit card debt. At trial, the Debtor testified that checks written out to casinos for the relevant period totaled $12,000.00 (*Id.* at 33–34 & Exhibit 11 to the Parties' Stipulation). Finally, the schedules disclose another $4,800.00 in unsecured gambling debt. *See Schedule F; Trial Transcript* at p. 37–38.

Also, this Court finds it interesting that the record establishes that withdrawal of money from Metal Manufacturing (A-Bust) occurred over several months in relatively small amounts—rather in large substantial sums. This suggests to the Court that it was not the Debtor's intent to "pocket" this money as alleged by the Plaintiff in its brief. This is supported by the fact that more often than not, the withdrawals reflected on the company's general ledger coincide within a few days or so with the date a casino marker was paid. *See,* Defendant's Exhibits # 10 & # 11, attached to the Parties' Stipulation. Any conjecture by Buckeye that money was "pocketed" is just mere speculation—nothing submitted in evidence remotely suggests that this was the case.

In summary, the Debtor satisfied his burden at trial in explaining and demonstrating the dissipation of certain assets. This case is a far-cry from a debtor at-

tempting to stonewall his creditors. The record is replete with documents requested by a creditor and ultimately then produced by the debtor. As a result, Buckeye's request to deny the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(5) is denied.

For the foregoing reasons, the Court finds in favor of the Defendant Tauber, and judgment will be entered accordingly.

IT IS ORDERED, ADJUDGED AND DECREED that Buckeye Retirement Properties of Indiana, LLC's complaint for denial of discharge of Jan Earl Tauber pursuant to 11 U.S.C. § 727(a) is denied, and that discharge of the debtor will be entered by the Court.